# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 01-2024

_____

| | | |
|---|---|---|
| United States of America,<br>ex rel. Maynard Bernard, | * <br> * <br> * | |
| Appellant, | * <br> * | |
| | * | Appeal from the United States |
| v. | * | District Court for the |
| | * | District of South Dakota. |
| Casino Magic Corp., a Minnesota<br>Corporation; Casino Magic American<br>Corp., a Minnesota Corporation, | * <br> * <br> * <br> * | |
| Appellee. | * | |

_____

Submitted:  December 12, 2001

Filed:  June 7, 2002 (Corrected June 10, 2002)

_____

Before McMILLIAN, HEANEY and MURPHY, Circuit Judges.

_____

HEANEY, Circuit Judge.

The United States and its relator, Maynard Bernard, appeal an adverse grant of summary judgment in this qui tam action.[1] We hold the district court erred as a matter

_____

[1] United States ex rel. Steele v. Turn Key Gaming, Inc., 260 F.3d 971, 973-74 (8th Cir. 2001) (rehearing en banc denied Oct. 16, 2001) (quoting 25 U.S.C. § 81), states:

of law in concluding there was no management agreement, and reverse and remand for further action consistent with this opinion.

## I.     Background

## A.     Management and Consulting Agreements

We adopt the factual findings of the district court, which we summarize here. In 1993, the Sisseton-Wahpeton Sioux Tribe (the Tribe) became interested in building and operating a casino on Indian trust land within the Tribe's Lake Traverse Reservation in North Dakota. The Tribe entered into a management agreement with Casino Magic on July 22, 1994. The agreement, created in accordance with the Indian Gaming Regulatory Act, 25 U.S.C. § 2701 et seq. (IGRA), provided that Casino Magic would become the manager of the Sisseton-Wahpeton Dakota Nation Casino Gaming Enterprise, to be known as Dakota Magic Casino. For a management agreement involving Indian land to become a binding legal document, it must be approved by the National Indian Gaming Commission (NIGC). See 25 U.S.C. §§ 2710(d)(9), 2711.[2]   The Tribe and Casino Magic agreed that such approval was a

25 U.S.C. § 81 governs all contracts with an Indian tribe whereby the tribe trades consideration for "services for said Indians relative to their lands." All such agreements must "bear the approval of the Secretary of the Interior and the Commissioner of Indian Affairs indorsed upon [them]." Any agreement subject to Section 81, but not so indorsed, "shall be null and void, and all money or other thing of value paid to any person by any Indian or tribe . . . may be recovered by suit in the name of the United States."

[2]"IGRA recognizes a tribe's authority to enter into contracts for the management and operation of an Indian gaming facility by an entity other than the tribe or its employees, so long as certain requirements are satisfied and subject to approval by the Chairman of the National Indian Gaming Commission." Casino

condition precedent to the contract becoming a binding legal document. The agreement was submitted to the NIGC but was never approved for reasons not clarified by the record.

On September 15, 1994, after finalizing the terms of the management contract, and perhaps anticipating that the Management Agreement would be approved, the Tribe and Casino Magic entered into a Secured Loan Agreement. Under the terms of this agreement, Casino Magic agreed to loan up to $5 million to the Tribe so that it could begin to build the casino. It was contemplated by both parties that once the management contract was approved, the proceeds of the loan would be repaid. In September 1994, Casino Magic advanced $4,102,718.45 to the Tribe, which the Tribe later repaid once it received a $17.5 million loan from the BNC National Bank of Bismark, North Dakota, (BNC).

Because the Management Agreement was never approved, the parties entered into a Consulting Agreement on March 13, 1996, under which Casino Magic was to become a consultant to assist the Tribe in developing and operating the gaming enterprise. The Consulting Agreement specifically stated that Casino Magic had no management authority over the casino. It agreed to "conduct market feasibility studies, develop and identify market plans, and to provide an accounting system, written system of internal controls, security plan, and a job classification system with training." United States Ex. Rel. Maynard Bernard v. Casino Magic Corp., Civ. 98-

_____

Resource Corp. v. Harrah's Entertainment, 243 F.3d 435, 438 n.3 (8th Cir. 2001) (citing 25 U.S.C. §§ 2710(d)(9), 2711). Although the IGRA was passed in 1988, the regulatory scheme created by the Act did not take effect until the NIGC came into existence, some five years later. The preexisting regulatory scheme, administered by the Bureau of Indian Affairs, remained in effect until 1993. See U.S. ex rel. Mosay v. Buffalo Bros. Mgt., Inc., 20 F.3d 739, 744 (7th Cir. 1994). Today, the BIA reviews certain consulting agreements with Tribes related to Indian gaming that do not constitute management agreements subject to NIGC review.

1033, slip op. at 4 n.2 (D. S.D. April 23, 2001) (order granting motion for summary judgment). Casino Magic also agreed to develop a long-term master plan for the casino.

The parties submitted the Consulting Agreement to the NIGC for approval to avoid any future dispute regarding the legitimacy of the agreement. The NIGC determined that the Consulting Agreement was not a management contract and therefore did not require the approval of the NIGC. In its February 7, 1996 letter to the Tribe, the NIGC wrote:

> While Casino Magic will be advising and consulting on many aspects of the gaming enterprise, pursuant to the Consulting Agreement, the Tribe will retain ultimate control and direction of the casino operation. Because the Consulting Agreement does not provide for the management of all or part of the Tribe's gaming operation by any person or entity other than the Tribe or its employees, it is not a management contract. Therefore this Agreement does not require the approval of the Chairman.

(Appellant's Separate App. at 190).

The BIA also approved the Consulting Agreement. It sent a Section 81 Accommodation Approval and Disclaimer to the parties in February, 1996. The disclaimer stated in part:

> The Department has reviewed this Agreement, determined that it does not constitute an agreement relative to the Tribe's trust land or other trust assets and, therefore, this Agreement is not subject to the provisions of 25 U.S.C. § 81. As a result, this statute does not limit or impair the Tribe's capacity to make or enter into this agreement without

obtaining the approval of the Secretary of the Interior and the Commissioner of Indian Affairs.

(Id. at 191).

B.    The Construction and Term Loan Agreement and the Participation Agreement

On June 7, 1996, BNC and the Tribe entered into a Construction and Term Loan Agreement. Under the terms of the agreement, BNC agreed to make advances to the Tribe in the aggregate amount of $17.5 million, conditioned upon Casino Magic's commitment to contribute to the loan up to $5 million, or 28.6 percent of the loan. Article V, Section 5.1 (p) of the Agreement obliged the Tribe to "accept and comply with all of the recommendations made by the Consultant under the Consulting Agreement, except to the extent that any such recommendations are not consistent with current Indian Gaming Practices or industry standards." ( Id. at 209). Casino Magic was not a party to the Construction and Term Loan Agreement. The district court determined that Casino Magic's status as "consultant" continued after the Construction and Term Loan Agreement became effective.

On June 28, 1996, BNC and Casino Magic entered into a Participation Agreement to formalize Casino Magic's consent to contribute a percentage of the Tribe's financing for the casino. The Participation Agreement stated in relevant part: "this loan participation [agreement] constitutes a sale of a percentage ownership interest in the referenced indebtedness, and, collateral security and in the 'loan documents' . . . and shall not be construed as an extension of credit by [Casino Magic] to [BNC]." (Appellant's Separate App. at 233).

The parties submitted the Construction and Term Loan Agreement to the BIA for § 81 approval, but it was not submitted to the NIGC. On July 10, 1996, the BIA issued a Section 81 Accommodation Approval and Disclaimer letter stating, "The Department has reviewed the documents, determined that they do not constitute an

-5-

agreement relative to the Tribe's trust land or other trust assets and, therefore, the Documents are not subject to the provisions of 25 U.S.C. § 81." (Appellee's App. at 753).

The Tribe received its first advance from the approved loan after receipt of this letter. As part of this first disbursement, Casino Magic received a cashier's check from BNC in the amount of $4,102,718.45 to satisfy the Tribe's pre-existing loan obligation under the 1994 Secured Loan Agreement.

On January 15, 1998, Casino Magic requested a consulting fee payment from the Tribe under the terms of the Consulting Agreement. On January 28, 1998, before paying the consulting fee, the Tribe terminated the Consulting Agreement. Following termination, the Tribe submitted the Consulting Agreement and the Construction and Term Loan Agreement to the NIGC for joint review. After inspecting both documents, the NIGC stated in relevant part:

> Certain provisions of the submitted documents are of particular concern to the construction of the management contract. More specifically, Section 5.1(p) of the Construction and Term Loan Agreement requires that the Tribe "accept and comply with all of the recommendations made by the Consultant under the Consulting Agreement . . ." pg. 17. The Agreement further provides that . . . "[T]he Tribe will maintain the Consulting Agreement . . . in full force and effect . . .", and limits the Tribe's ability to terminate the Agreement while there is any outstanding balance due to the BNC National Bank. Section 5.1(g) pgs. 17-18. As mentioned in your request letter dated February 12, 1998, these provisions call into question the actual relationship between the Sisseton-Wahpeton Sioux Tribe and CMA.
>
> After careful review, we have determined that the Consulting Agreement and related documents, when considered as a whole, are

management contracts. As such, the submitted documents require the approval of the Chairman of the NIGC.

(Appellant's Separate App. at 188).

The Tribe replaced Casino Magic with another consulting company, and on October 9, 1997, Bernard filed a qui tam action on behalf of the United States government claiming that 25 U.S.C. § 81, 18 U.S.C. § 438, and 25 U.S.C. § 2711 had been violated. He alleged that the Consulting Agreement and the Construction and Term Loan Agreement, when considered together, comprised a management contract that required NIGC approval. He argued that the parties' failure to seek such approval voided the contracts under § 81, requiring Casino's Magic's return of an amount in excess of $7 million dollars "extracted from the Tribe" under the unapproved agreement.

Casino Magic sought summary judgment as a matter of law, contending that there was no § 81 violation because the Consulting Agreement was approved by the BIA on behalf of the Secretary of the Interior and the Commissioner of Indian Affairs, and was reviewed by the NIGC, which concluded it did not have to approve the contract because it was not a management agreement. Casino Magic also asserted that it had not been paid any fees by the Tribe; it had only been reimbursed the $4,102,718.45 that it had advanced to the Tribe for construction, plus an additional $350,000 it had advanced to the Tribe for other expenses.[3] The district court granted Casino Magic's motion, holding that, contrary to Bernard's contention, the Construction and Term Loan Agreement between the Tribe and BNC did not convert the Consulting Agreement into a management contract requiring the approval of the NIGC. It stated:

---

[3]At oral argument, the appellant stated that he only sought the return of any fees paid by the Tribe to Casino Magic.

[t]he record is clear that Casino Magic performed its consulting duties in a manner that resulted in the development of a well planned and maintained casino. When the casino became profitable and Casino Magic demanded payment pursuant to the Consulting Agreement, the tribe terminated their relationship and later submitted the Consulting Agreement and the Construction Loan Agreement [sic] to the NIGC with the suggestion that, when read jointly, they comprised a "management contract" requiring approval under 25 U.S.C. § 81 and § 2711. Because Congress never intended the qui tam provision of § 81 to be used in the manner proposed by plaintiff, and based upon the reasons stated above, it is hereby ordered that Casino Magic's motion for [summary judgment] is granted.

United States Ex. Rel. Maynard Bernard v. Casino Magic Corp., Civ. 98-1033, slip op. at 14-15 (D. S.D. April 23, 2001) (order granting motion for summary judgment) (footnote omitted).

On appeal, Bernard asks us to consider whether the district court: erred in granting summary judgment in favor of Casino Magic; abused its discretion in denying plaintiff's motion to amend its complaint to add BNC as an additional party; and abused its discretion in refusing to extend the deadline for discovery. We reverse the grant of summary judgment, hold that the agreements, when considered together, constituted a management agreement, and remand for action consistent with this opinion.

II.    Discussion

This court reviews a district court's grant of summary judgment de novo. FED. R. CIV. P. 56(c); Genosky v. State of Minnesota, 244 F.3d 989, 992 (8th Cir. 2001). The record must be viewed in the light most favorable to the non-moving party. Casino Resource Corp. v. Harrah's Entm't, Inc., 243 F.3d 435, 437 (8th Cir. 2001).

The primary issue between the parties is whether the Consulting Agreement, the Construction and Term Loan Agreement, and the Participation Agreement together, as a matter of law, comprised a management agreement (or a series of management agreements) not properly approved by the NIGC in accordance with 25 U.S.C. § 2711, and therefore unenforceable. If the agreements were in fact invalid, the Tribe expects Casino Magic to return <u>any fees</u> paid to it under the terms of the invalid agreements, excluding the Tribe's secured loan repayment to Casino Magic and any other out-of-pocket expense.

A.      The Effect of the Three Agreements

After reviewing the Consulting Agreement and the Construction and Term Loan Agreement entered into by the Tribe and BNC, the district court held that the Tribe's agreement to "accept and comply with all recommendations made by the Consultant" in section 5.1(p) of the Construction and Term Loan Agreement was "insufficient to change Casino Magic's obligations to the tribe from that of a consultant to that of a manager." <u>United States Ex. Rel. Maynard Bernard v. Casino Magic Corp.</u>, Civ. 98-1033, slip op. at 14 (D. S.D. April 23, 2001) (order granting motion for summary judgment). The court determined that the record was "devoid of any facts from which a reasonable jury could find that Casino Magic began to act as a manager after the Construction and Term Loan Agreement was finalized." <u>Id.</u>

We disagree. When the NIGC had the opportunity to review the Consulting Agreement and the Construction and Term Loan Agreement together, it determined that the documents created a management agreement, requiring NIGC approval under 25 U.S.C. § 2711. Without such approval, the agreements were invalid. Moreover, the Participation Agreement gave Casino Magic a percentage ownership interest in the Tribe's indebtedness. That interest, combined with the other documents' impact, transferred more authority to Casino Magic than what the Consulting Agreement,

reviewed by the NIGC and the BIA, actually provided. The Consulting Agreement stipulated that the "Consultant has no management authority or control with regard to the Enterprise or the Existing Facilities, but shall act only as a consultant offering consulting services . . . . [A]ll decision-making authority shall rest solely with the Tribe." (Consulting Agreement ¶ F, Appellant's Separate App. at 163-64). The Tribe's ultimate authority, however, was effectively revoked by the terms of section 5.1(p) of the Construction and Term Loan Agreement, which mandated the Tribe's compliance with Casino Magic's recommendations.

The district court advanced four reasons for its decision to grant summary judgment in favor of Casino Magic. We do not find these reasons persuasive. First, the court explained that "the post-cancellation of the [Consulting Agreement] does not provide Bernard with a cause of action under § 81." United States Ex. Rel. Maynard Bernard v. Casino Magic Corp., Civ. 98-1033, slip op. at 13 (D. S.D. April 23, 2001) (order granting motion for summary judgment).[4] At first opportunity, the Chairman of the NIGC held that the Consulting Agreement and the Construction and Term Loan Agreement, considered together, were management contracts. (Appellant's Separate App. at 188). Casino Magic was aware of the combined effect of all agreements, and it assumed the risk of proceeding without having submitted all documents to the Chairman. We therefore find that Bernard did, in fact, have a valid cause of action under § 81.

Second, the district court explained that Casino Magic was not a party to the Construction and Term Loan Agreement, and neither that agreement nor the Participation Agreement mandated the condition that Casino Magic assume managerial responsibilities of the casino. Although this finding is correct, it does not

---

[4]To correct the record, we note that the Indian Gaming Regulatory Act was adopted in 1988 rather than 1998, as indicated by the district court. See discussion in footnote 2.

change the fact that Casino Magic was aware of the terms of the Construction and Term Loan Agreement, which limited the Tribe's powers and enhanced those of Casino Magic. A management contract includes the principal contract and "all collateral agreements to such contract that relate to the gaming activity." 25 U.S.C. § 2711(a)(3). The three agreements discussed above served as a management contract implicitly if not explicitly.

Third, the court below stated, "the record is devoid of any facts from which a jury could find that Casino Magic began to act as a manager after the Construction and Term Loan Agreement was finalized." United States Ex. Rel. Maynard Bernard v. Casino Magic Corp., Civ. 98-1033, slip op. at 14 (D. S.D. April 23, 2001) (order granting motion for summary judgment). In our view, this lack of evidence is irrelevant. The issue is whether Casino Magic, in fact, had managerial control. The NIGC found that it had, given the combined effect of the series of agreements. We defer to that finding. See Bruce H. Lien Co. v. Three Affiliated Tribes, 93 F.3d 1412, 1418 n.10 (8th Cir. 1996) ("a permissible agency interpretation on this issue [of whether the management contract requires NIGC review] would merit considerable deference") (citing Arkansas AFL-CIO v. FCC, 11 F.3d 1430, 1441 (8th Cir. 1993)).

Finally, the court explained that Congress did not intend § 81 to be used "as a sword to regain monies paid under a series of agreements" serving only to benefit the Tribe. Id. The district court cites no authority for this proposition, and we find none. The law is clear that management agreements must be approved by the Chairman of the NIGC. Without that approval, invalid management fees must be recovered on behalf of the Tribe. We cannot ignore the plain words of § 2711 nor the Chairman's findings that taken as a whole, the series of agreements constituted a management agreement. Thus, appellant is entitled to recover any fees paid by the Tribe to Casino Magic.

-11-

B.    Amended Complaint and Extended Discovery

We next consider whether the district court abused its discretion by denying Bernard's motion to amend his complaint to add BNC as an additional party. We review an order to deny leave to amend a complaint for abuse of discretion. Bell v. Allstate Life Ins. Co., 160 F.3d 452, 454 (8th Cir. 1998) (citations omitted). Federal Rule of Civil Procedure 15(a)(2001) provides that "a party may amend the party's pleading only by leave of court or by written consent of the adverse party; and leave shall be freely given when justice so requires." However, "[w]here an amendment would likely result in the burdens of additional discovery and delay to the proceedings, a court usually does not abuse its discretion in denying leave to amend." Popp Telcom v. American Sharecom, Inc. 210 F.3d 928, 943 (8th Cir. 2000) (citation omitted). Bernard's attempt to include BNC as an additional defendant two and a half years into the litigation would have extended the matter indefinitely. We believe it was possible for Bernard to extract relevant information regarding BNC's role in the dispute without joining it as a party, and therefore affirm the district court's order not to permit Bernard to amend his complaint to include BNC as a defendant.

The final issue for our consideration is whether the district court abused its discretion by refusing to extend the discovery deadline. See Stanback v. Best Diversified Products, 180 F.3d 903, 910-11 (8th Cir. 1999) (citation omitted). Bernard claims that he was entitled to additional discovery because Casino Magic engaged in obstructionist and delay tactics in violation of Federal Rule of Civil Procedure 26(a)(1)(B), and failed to designate an adequate corporate representative for its deposition under Rule 30(b)(6). He alleges that these actions hampered his attempt to gather necessary documents during the discovery period.

A party opposing summary judgment who believes that he has not had adequate opportunity to conduct discovery must seek relief pursuant to Federal Rule of Civil Procedure 56(f), which requires that party to show "what specific facts further

discovery might unveil." Stanback v. Best Diversified Products, Inc., 180 F.3d 903, 911 (8th Cir. 1999) (quoting Dulany v. Carnahan, 132 F.3d 1234, 1238 (8th Cir. 1997)). The court may then refuse to grant summary judgment, order a continuance to permit further discovery, or "such other order as is just." FED. R. CIV. P. 56(f). "The purpose of subdivision (f) is to provide an additional safeguard against an improvident or premature grant of summary judgment . . . and [the rule] should be applied with a spirit of liberality." 10B Wright, Miller & Kane, Federal Practice and Procedure: Civil 3d § 2740 (1998).

The record shows that Bernard filed a 56(f) request to extend the discovery deadline due to Casino Magic's alleged discovery abuses. He failed to attach an affidavit to support his request. The district court granted summary judgment in Casino Magic's favor without addressing the discovery abuses, noting that "both parties [had] been given the opportunity to engage in extensive discovery." United States Ex. Rel. Maynard Bernard v. Casino Magic Corp., Civ. 98-1033, slip op. at 9 n.5 (D. S.D. April 23, 2001) (order granting motion for summary judgment).

We acknowledge that the discovery period in the matter exceeded two years, and that both parties contributed to the delay. It was within the district court's discretion to refuse to extend the discovery period. In light of our decision that summary judgment must be reversed, discovery must continue for a single purpose: to determine what fees were paid by the Tribe to Casino Magic, as the record is hopelessly unclear as to whether any fees were paid, and if so, the amount thereof.

III. Conclusion

The district court erred in holding as a matter of law that the Consulting Agreement, the Construction and Term Loan Agreement, and the Participation Agreement constituted a consulting agreement rather than a management agreement.

We reverse the district court's grant of summary judgment and remand for proceedings consistent with this opinion.

A true copy.

Attest:

CLERK, U. S. COURT OF APPEALS, EIGHTH CIRCUIT.