**MATCH–E–BE–NASH–SHE–WISH BAND OF POTTAWATOMI INDIANS, Plaintiff,**

v.

**KEAN–ARGOVITZ RESORTS, KEAN ARGOVITZ RESORTS–MICHIGAN, LLC, Defendants.**

**No. 1:02–CV–194.**

United States District Court, W.D. Michigan, Southern Division.

Feb. 19, 2003.

Kevin J. Gleeson, Sullivan, Ward, Bone, Tyler & Asher P.C., Southfield, MI, Barry L. Levine, Barry L. Levine & Associates, PLC, Traverse City, MI, for Kean–Argovitz Resorts.

Shilee T. Mullin, Conly J. Schulte, Monteau & Peebles, L.L.P., Omaha, NE, for Match–E–Be–Nash–She–Wish Band of Pottawatomi Indians.

## OPINION

QUIST, District Judge.

This federal question action arises out of a series of agreements between the Match–E–Be–Nash–She–Wish Band of Potawatomi Indians ("MBPI") and Kean–Argovitz Resorts ("KAR") and Kean–Argovitz Resorts–Michigan, LLC ("KAR–MI") (collectively "KAR") for the development and management of a proposed gaming facility in Michigan. MBPI unilaterally terminated its relationship with KAR prior to the Chairman of the National Indian Gaming Commission's ("NIGC") approval of the parties' agreements. KAR seeks to compel MBPI to arbitrate the dispute pursuant to the Arbitration Clause in the parties' Development Agreement.

Before the Court are MBPI's, Motion for Summary Judgment (Docket No. 23) and KAR's Motion for Summary Judgment Compelling Arbitration (Docket No. 26). The Court will grant MBPI's Motion for Summary Judgment and deny KAR's Motion for Summary Judgment Compelling Arbitration.

### Factual and Procedural Background

MBPI is a federally recognized Indian Tribe whose tribal homelands and current tribal headquarters are located in the Western District of Michigan. 63 Fed. Reg. 56,936 (Oct. 23, 1998). MBPI currently does not own any reservation land, nor title to land which is held in trust by the United States for the benefit of MBPI. KAR and KAR–MI are Delaware corporations.

On November 12, 1998, KAR and MBPI entered into a Management Agreement (Management Agreement, Pl.'s Br. Supp. Mot. Summ. J. Ex. A), and a Development Agreement (Development Agreement, Pl.'s Br. Supp. Mot. Summ. J. Ex. B) for a future gaming facility located on tribal lands in Michigan. The Management

Agreement sets forth how the proposed gaming facility will be operated, and the Development Agreement sets forth the steps KAR and MBPI will take to acquire tribal land and develop the gaming facility.[1] The Development Agreement contains an Arbitration Clause and a limited waiver of MBPI's sovereign immunity as an alternative dispute mechanism. (Development Agreement § 14.2.)

On February 2, 1999, KAR and MBPI executed an Interim Promissory Note ("Promissory Note") (Defs.' Mem. Supp. Summ. J. Compelling Arbitration Ex. 1) and a Security and Reimbursement Agreement (Defs.' Mem. Supp. Summ. J. Compelling Arbitration Ex. 2). The Promissory Note reflected that KAR, with the approval of MBPI, had transferred its interest to KAR–MI. (Promissory Note at 1.) From November 1998 through January 2000, KAR expended approximately $1,000,000.00 in advances to MBPI. KAR made monthly payments to MBPI pursuant to Article 9 of the Development Agreement, and KAR obtained options on various parcels of land for the benefit of MBPI.

On January 10, 2000, MBPI unilaterally terminated its agreements with KAR via a letter to KAR from MBPI attorneys. (Letter from Schulte to Kean of 1/10/00, Defs.' Mem. Supp. Summ. J. Compelling Arbitration Ex. 3.) On January 4, 2001, KAR submitted its Demand for Arbitration to the American Arbitration Association ("AAA") and duly served it upon MBPI. (Demand for Arbitration, Defs.' Mem. Supp. Summ. J. Compelling Arbitration Ex. 4.) MBPI has refused to submit to arbitration, asserting that the Development Agreement, and the Arbitration Clause therein, is void because it is collateral to a management contract which was never approved by the Chairman of the NIGC pursuant to the Indian Gaming Regulatory Act ("IGRA"), 25 U.S.C. §§ 2711, 2712; 25 C.F.R. § 533.7. MBPI has not returned to KAR the approximately $1,000,000.00 that KAR advanced to MBPI pursuant to the Development Agreement.[2]

On March 22, 2002, MBPI filed a complaint seeking declaratory judgment and injunctive relief against KAR, requesting that the Court find the Development Agreement, and the Arbitration Clause therein, void and enter a temporary restraining order, preliminary injunction and permanent injunction restraining KAR from prosecuting, enforcing, or attempting to enforce the Arbitration Clause. On September 10, 2002, KAR filed a counterclaim against MBPI, seeking to compel MBPI to submit to arbitration. MBPI filed its Motion for Summary Judgment on its claim and KAR's counterclaim on September 30, 2002. KAR filed its Motion for Summary Judgment Compelling Arbitration on October 1, 2002.

### Standard of Review

Summary judgment is appropriate if there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. Fed. R.Civ.P. 56. Material facts are facts which are defined by substantive law and are necessary to apply the law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106

---

1. KAR was to make monthly advances to MBPI and agreed to loan MBPI up to $100,000,000.00 for the project. (Development Agreement, Art. 9.) The scope of the development project is specified in Exhibit A to the Development Agreement. (Development Agreement, Ex. A.)

2. MBPI has stated that it would return all of the money that KAR has advanced to MBPI pursuant to the Development Agreement. (Letter from Peebles to Guida of 1/25/00 at 4, Pl.'s Reply Defs.' Opp'n Pl.'s Mot. Summ. J. Ex. 5–C.)

S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). A dispute is genuine if a reasonable jury could return judgment for the non-moving party. *Id.*

The court must draw all inferences in a light most favorable to the non-moving party, but may grant summary judgment when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Agristor Fin. Corp. v. Van Sickle,* 967 F.2d 233, 236 (6th Cir.1992) (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986)).

### Discussion

### I. *No Material Facts in Dispute*

Neither MBPI nor KAR disputes that MBPI terminated the parties' business relationship on January 10, 2000, or that KAR submitted its Demand for Arbitration to the AAA on January 4, 2001. The parties also do not dispute that neither the Management Agreement nor the Development Agreement was submitted for approval or approved by the Chairman of the NIGC. Thus, the only question before the Court is whether the NIGC's approval of the Management Agreement and the Development Agreement are a condition precedent to the legal effectiveness of the Development Agreement's Arbitration Clause.

### II. *Validity of the Arbitration Clause*

■ MBPI, like all other federally recognized Indian tribes, enjoys common law sovereign immunity from suit unless Congress authorizes suit against the tribe or the tribe waives its immunity. *Kiowa Tribe of Okla. v. Mfg. Techs., Inc.,* 523 U.S. 751, 754, 118 S.Ct. 1700, 1702–03, 140 L.Ed.2d 981 (1998). While MBPI does not dispute that the Arbitration Clause of the Development Agreement constitutes a limited waiver of its sovereign immunity, MBPI argues that the Arbitration Clause,

and thus MBPI's waiver of its sovereign immunity, is void *ab initio.*

### A. *The Management Agreement Is Void*

■ To be valid, a management contract for an Indian gaming facility must be approved by the Chairman of the NIGC. 25 C.F.R. § 533.7 ("Management contracts and changes in persons with a financial interest in or management responsibility for a management contract, that have not been approved by the Secretary of the Interior or the Chairman ... are void."). It is uncontested that the Management Agreement in the instant case falls within the definition of a "management contract" under 25 C.F.R. § 533.7. The Management Agreement thus required NIGC approval pursuant to 25 U.S.C. § 2711(a)(1). Accordingly, since the Management Agreement was never approved by the Chairman of the NIGC, the Management Agreement is void *ab initio* under the IGRA.

### B. *The Development Agreement Is Collateral to the Management Agreement*

The Court must next consider whether the Development Agreement is collateral to the Management Agreement and thus void *ab initio* under the IGRA. Collateral agreements to Indian gaming management contracts must be approved by the Chairman of the IGRA. 25 U.S.C. § 2711(a)(3); 25 C.F.R. § 502.15 (defining "management contact" as "any contract, subcontract, or collateral agreement"). A "collateral agreement" is defined as "any contact ... that is related, either directly or indirectly, to a management contract, or to any rights, duties or obligations created between a tribe ... and a management contractor or subcontractor." 25 C.F.R. § 502.5. Thus, since it is uncontested that the Development Agreement was not ap-

proved by the Chairman of the IGRA, the Development Agreement is void *ab initio* if it is a collateral agreement to the Management Agreement.

### 1. *KAR's Argument*

KAR asserts that the Development Agreement is not a collateral agreement based on Development Agreement's text. It is true that "[n]ot every contract that is merely peripherally associated with tribal gaming is subject to IGRA's constraints." *Casino Res. Corp. v. Harrah's Entm't, Inc.,* 243 F.3d 435, 439 (8th Cir.2001) (citing *Int'l Gaming Network v. Casino Magic Corp.,* 120 F.3d 135 (8th Cir.1997)); *see also Calumet Gaming Group–Kan., Inc. v. Kickapoo Tribe of Kan.,* 987 F.Supp. 1321, 1325 (D.Kan.1997); *Gallegos v. San Juan Pueblo Bus. Dev. Bd., Inc.,* 955 F.Supp. 1348, 1350 (D.N.M.1997). KAR posits that the Development Agreement explicitly manifests MBPI's intent to waive its sovereign immunity and be bound by the Arbitration Clause regardless of whether the Chairman of the IGRA approved the Management Agreement or the Development Agreement.

Article 15 of the Development Agreement, entitled "General," states:

> **Section 15.1. Nature of Agreement.** This Agreement is not intended as a Management Agreement and shall not be construed as a "management agreement" within the meaning of the IGRA.

(Development Agreement, Art. 15, § 15.1.)

Article 2 of the Development Agreement, entitled "Independent Agreement," states:

> **Section 2.1 Independent Agreement.** The objective of MBPI and KAR in entering into and performing this Agreement is to provide a legally enforceable procedure and agreement pursuant to which KAR will make certain loans to MBPI, and whereby MBPI and KAR can proceed as far as possible with

the acquisition of the Tribal Lands and the development of the MBPI Governmental and MBPI Commercial Development, and the Gaming Facility prior to the approval of the Management Agreement by the NIGC so that the Projects can commence operation as soon as possible; and *set forth the rights and obligations of the parties if approval of the Management Agreement by the NIGC does not occur. This is intended to be a legally enforceable agreement, independent of the Management Agreement, which shall enter into effect when executed and delivered by the parties, and be enforceable between the parties regardless of whether or not this Agreement or the Management Agreement is approved by the Chairperson of NIGC.*

(*Id.,* Art. 2, § 2.1 (emphasis added).)

KAR thus argues that IGRA approval was not a condition precedent to the Development Agreement becoming effective, and the Court should give effect to the manifested intent of the parties to arbitrate their dispute.

### 2. *MBPI's Argument*

MBPI counters that the disclaimer language of the Development Agreement is not determinative under the IGRA. Rather, MBPI asserts that there is ample evidence within the text of the Development Agreement which establishes its linkage to the Management Agreement, thus rendering it collateral to the Management Agreement. *See United States v. Casino Magic Corp.,* 293 F.3d 419, 425 (8th Cir.2002) (finding that a consulting agreement was collateral to a management contract, and thus requiring approval by the Chairman of the NIGC, because the "combined effect of the series of agreements" gave the casino developer "managerial control"). The Development Agreement contains the fol-

lowing terms relating to KAR's management of future gaming operations:

1.  KAR has agreed to make available to MBPI, either by directly lending funds or guaranteeing a loan by a financial institution, sufficient funds to finance the acquisition of the Tribal Land and the Gaming Facility, and has agreed to make certain other loans directly to MBPI and advance certain other fees for MBPI *as consideration for the exclusive right to develop and manage the Gaming Facility pursuant to the Management Agreement, and for other development rights as described herein.*

     (Development Agreement, Recital J. (emphasis added).)

2.  Regarding KAR's Loan Commitment to MBPI:

     KAR shall provide a firm financing commitment acceptable to MBPI, to finance the acquisition of the Tribal Lands and to pay for all costs of design, development, construction and opening of the Gaming Facility, including but not limited to all planning, professional fees, land acquisition costs, development, infrastructure improvements, construction and pre-opening costs, fees and expenses (the "Loan") on terms to MBPI as follows:

     .    .    .    .    .

     (ii) *The Loan shall be repayable solely out of revenues of the Gaming Facility* ...

     (iii) MBPI shall covenant not to encumber any of the assets of the Gaming Facility without KAR's prior written consent....

     .    .    .    .    .

     (viii) *It shall be a condition of the loan commitment that a management agreement between MBPI and KAR in substantially the form of the Management Agreement, and this Development Agreement, be approved by the chairman of the NIGC.*

     (*Id.* § 9.2 (emphasis added).)

3.  Regarding Exclusivity:

     *MBPI shall deal exclusively with KAR* for gaming development on Tribal Lands for a period beginning on the date of execution of this Agreement and *ending upon termination of the Management Contract* ....

     (*Id.* § 10.2 (emphasis added).)

MBPI also argues that the NIGC has already determined that the Development Agreement is a collateral agreement to a management contract. In a letter to Chairman David K. Sprague dated November 5, 1999, NIGC's Deputy General Counsel, Penny J. Coleman ("Coleman"), stated:

The purpose of our review is to determine whether [the Development Agreement] is a management contract or collateral agreement to a management contact and therefore subject to our review and approval under the Indian Gaming Regulatory Act ("IGRA"). We conclude that the Agreement is collateral to a management contract and must be reviewed in conjunction with the Management Agreement between Golden Bear and the Tribe.[3]

(Letter from Coleman to Sprague of 11/5/99, Pl.'s Br. Supp. Mot. Summ. J. Ex. C.) MBPI asserts that Coleman's opinion should be given great weight by the Court. *See Casino Magic Corp.,* 293 F.3d at 424–25.

---

**3.** In a subsequent letter, Lisa L. Atkinson of the NIGC stated: "The reference to Golden Bear was an error. The letter should have stated that 'the agreement is collateral to a management contact and must be reviewed in conjunction with the management agreement between Kean–Argovitz and the Tribe,' and should not have referred to Golden Bear." (Letter from Atkinson to Pebbles of 11/15/99, Pl.'s Br. Supp. Mot. Summ. J. Ex. D.)

### 3. *Discussion*

■ The Court agrees with Coleman's characterization of the Development Agreement as collateral to the Management Agreement.[4] Despite the parties' best efforts to insert language into the Development Agreement labeling it separate and distinct from the Management Agreement, the terms of the Development Agreement evidence that it was directly related to the Management Agreement and KAR's management of the gaming facility. Essentially, the Development Agreement sets forth all of the funding necessary to effectuate KAR's exclusive stake in the gaming facility's profits, which directly relates to the rights, duties, and obligations created between MBPI and KAR, MBPI's management contractor. The Development Agreement enumerates KAR's various financial commitments to MBPI as consideration for the "exclusive right to develop and manage the Gaming Facility," with the exclusive relationship "ending upon Termination of the Management Contract." KAR's loan commitments to MBPI are conditioned on the Chairman of the NIGC's approval of the Management Agreement and the loans are to be "repayable solely out of revenues of the Gaming Facility." The Court thus finds that the Development Agreement is a collateral agreement to the Management Agreement pursuant to 25 C.F.R. § 502.5. Accordingly, the Development Agreement is void *ab initio* since it has not been approved by the Chairman of the IGRA.

### C. *The Arbitration Clause Is Void*

The Court must next determine whether the Development Agreement's Arbitration Clause[5] is nonetheless still legally opera-

---

4. The Court notes that it is not bound by Coleman's characterization, even though the Court reaches the same conclusion through its independent analysis of the Development Agreement.

5. Article 14 of the Development Agreement, entitled "Dispute Resolution," states:

**14.1. General.** The parties agree that binding arbitration pursuant to this Article 14 shall be the remedy for all disputes, controversies and claims arising out of this Development Agreement . . .

(i) Each party agrees that it will use its best efforts to negotiate an amicable resolution of any dispute between KAR and MBPI arising from this Agreement. *If MBPI and KAR are unable to negotiate an amicable resolution of a dispute within 14 days from the date of notice of the dispute pursuant to the notice section of this Agreement, or such other period as the parties mutually agree in writing, either party may refer the matter to arbitration as provided herein.*

(ii) The MBPI's election to terminate this Agreement is, however, final and conclusive and not subject to dispute resolution between the parties, but *only if the NIGC makes a final determination that KAR is not suitable to hold a license* . . . .

**Section 14.3 Arbitration**

**Section 14.2.1. Initiation of Arbitration and Section of Arbitrators.** Arbitration shall be initiated by written notice by one party to the other pursuant to the notice section of this Agreement, and the Commercial Arbitration Rules of the American Arbitration Association shall thereafter apply. *The arbitrators shall have the power to grant equitable and injunctive relief and specific performance as provided in this Agreement.* If necessary, orders to compel arbitration or enforce an arbitration award may be sought before the United States District Court for the Western District of Michigan and any federal court having appellate jurisdiction over said court. . . .

**14.3. Limited Waiver of Sovereign Immunity.** *MBPI expressly and irrevocably waives its immunity from suit as provided for and limited by this Section. This waiver is limited to MBPI's consent to all arbitration proceedings, and actions to compel arbitration and to enforce any awards or orders issuing from such arbitration proceedings* which are sought solely in United States District Court for the Western District of Michigan and any federal court having appellate jurisdiction over said court . . .

(Development Agreement, Art. 14 (emphasis added).)

tive. KAR contends that the Court must give effect to the Arbitration Clause, despite the fact that the Development Agreement is void *ab initio*, pursuant to the Federal Arbitration Act ("FAA"), 9 U.S.C. § 4. MBPI counters that the Arbitration Clause, like the entire Development Agreement, is void pending the Chairman of the IGRA's approval of the Development Agreement.

### 1. *KAR's Argument*

KAR contends that the FAA controls the arbitrability of the Development Agreement.[6] The Sixth Circuit recently addressed the FAA at length in *Great Earth Companies, Inc. v. Simons*, 288 F.3d 878, 888–90 (6th Cir.2002). *See also Arnold v. Arnold Corp.-Printed Communications for Bus.*, 920 F.2d 1269, 1277–78 (6th Cir.1990). In *Simons*, the court stated:

> Section 4 of the FAA sets forth the procedure to be followed by the district court when presented with a petition to compel arbitration. That section provides, in relevant part, that
>
> > [a] party aggrieved by the ... refusal of another to arbitrate under a written agreement for arbitration may petition any United States district court ... for an order directing that such arbitration proceed in the manner provided for in such agreement.... The court shall hear the parties, and upon begin satisfied that the making

of the agreement for arbitration or the failure to comply therewith is not in issue, the court shall make an order directing the parties to proceed to arbitration in accordance with the terms of the agreement.... If the making of the arbitration agreement ... be in issue, the court shall proceed summarily to the trial thereof.

9 U.S.C. § 4. Thus, "[w]hen asked by a party to compel arbitration under a contract, a federal court must determine whether the parties have agreed to arbitrate the dispute at issue." *Stout [v. J.D. Byrider]*, 228 F.3d [709,] 714 [ (6th Cir.2000) ]. If the district court is satisfied that the agreement to arbitrate is not "in issue," it must compel arbitration. If the validity of the agreement to arbitrate is "in issue," the court must proceed to a trial to resolve the question. 9 U.S.C. § 4. In order to show that the validity of the agreement is "in issue," the party opposing arbitration must show a genuine issue of material fact as to the validity of the agreement to arbitrate. *See Doctor's Assocs., Inc. v. Distajo*, 107 F.3d 126, 129–30 (2d Cir.), *cert. denied*, 522 U.S. 948, 118 S.Ct. 365, 139 L.Ed.2d 284 (1997). The required showing mirrors that required to withstand summary judgment in a civil suit. *Id.* ...

Section 2 of the [FAA] governs the validity of arbitration agreements. It provides that a written agreement to

---

**6.** In order for an arbitration clause to fall within the jurisdiction of the FAA, it must involve commerce:

> A written provision in any maritime transaction or a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof, or an agreement in writing to submit to arbitration an existing controversy arising out of such a contract, transaction,

or refusal, shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.

FAA, 9 U.S.C. § 2. The Court finds that the subject matter of the Development Agreement, an agreement between an Indian tribe located in Michigan and a Delaware limited liability company with its principle offices in Texas to finance and construct a multi-million dollar gaming facility, involves commerce as defined by Article 2 of the FAA.

arbitrate disputes arising out of a contract involving interstate commerce "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. In determining whether the parties have made a valid arbitration agreement, "state law may be applied *if* that law arose to govern issues concerning the validity, revocability, and enforceability of contracts generally," although the FAA preempts "state laws applicable *only* to arbitration provisions." [*Doctor's Assocs. v.*] *Casarotto,* 517 U.S. [681,] 686–87, 116 S.Ct. 1652[, 1656, 134 L.Ed.2d 902 (1996) ] (quotation omitted). Therefore, state law governs "generally applicable contract defenses [to an arbitration clause], such as fraud, duress, or unconscionability". *Id.* at 687, 116 S.Ct. [at 1656]. In assessing whether an agreement to arbitrate has been made, moreover, "[c]ourts are to examine the language of the contract in light of the strong federal policy in favor of arbitration. Likewise, any ambiguities in the contract or doubts as to the parties' intentions should be resolved in favor of arbitration." *J.D. Byrider,* 228 F.3d at 714.

The Supreme Court has explained that in deciding whether a validity agreement to arbitrate exists, district courts may consider only claims concerning the validity of the arbitration clause itself, as opposed to the challenges to the validity of the contract as a whole:

> if the claim is fraud in the inducement of the arbitration clause itself-an issue which goes to the "making" of the agreement to arbitrate-the federal court may proceed to adjudicate it. But the statutory language [of the FAA] does not permit the federal court to consider claims of fraud in the inducement of the contract generally.

*Prima Paint Corp. v. Flood & Conklin Mfg. Co.,* 388 U.S. 395, 403–04, 87 S.Ct. 1801[, 1806], 18 L.Ed.2d 1270 (1967). Once the district court determines that a valid agreement to arbitrate exists, challenges to other distinct parts of the contract are to be resolved by the arbitrator. *Id.* In order to place the validity of the agreement to arbitrate in issues, therefore, the party opposing the petition to compel arbitration must state a "well founded claim of fraud in the inducement of the arbitration clause itself, *standing apart from the whole agreement,* that would provide grounds for the revocation of the agreement to arbitrate." *Arnold,* 920 F.2d at 1278.

*Simons,* 288 F.3d at 888–90 (emphasis in original).

KAR thus argues that pursuant to the FAA, the Court should examine only the validity of the Arbitration Clause, regardless of the validity of the Development Agreement as a whole. Since MBPI does not assert that it entered into the Arbitration Clause fraudulently, KAR asks the Court to order the parties to arbitrate.

### 2. *MBPI's Argument*

MBPI argues that since the Development Agreement is void without approval by the Chairman of the IGRA, the Arbitration Clause therein is also void. MBPI cites *A.K. Management Co. v. San Manuel Band of Mission Indians,* 789 F.2d 785 (9th Cir.1986), for the proposition that the Chairman of the IGRA's approval is required to effectuate any clause in a contract that is subject to NIGC approval pursuant to 25 U.S.C. § 2711(a)(1). *Id.* at 789. ("Since the entire contract is inoperable without BIA approval, the waiver is inoperable and, therefore, the tribe remains immune from suit."). The *A.K. Management* court stated: "The plain words of section 81 simply render this

contract void in the absence of BIA approval. Since it is void, it cannot be relied upon to give rise to any obligation by the Band, including an obligation of good faith and fair dealing." *Id.*[7] Thus, MBPI argues that the Court should not carve out an exception to the approval requirements of 25 U.S.C. § 2711(a)(1), simply because the clause at issue is an arbitration clause.

### 3. *Discussion*

■ The Court finds that the entire Development Agreement, including the Arbitration Clause, was void *ab initio* without the Chairman of the IGRA's approval. While *A.K. Management* did not involve an arbitration clause, the principle that IGRA approval is required under 25 U.S.C. § 2711(a)(1) to effectuate any clause in a collateral contract to an Indian gaming management contract comports with Congress' statutory requirements. KAR cites no case, and the Court has not located any case in its own research, that stands for the proposition that an arbitration clause in an Indian Gaming contract must be given effect regardless of IGRA approval.[8]

If the Court were to accept KAR's argument, it would render Congress' stated intention of requiring IGRA approval of management contracts for Indian gaming facilities a nullity. It would take out of the hands of the NIGC the decisions regarding whether management contracts can be entered into and put that decision into the hands of arbitrators. Since the Management Agreement was void from the beginning under federal law, it must follow that the Arbitration Clause is also void from the beginning.

This analysis is quite different from determining whether a contract is voidable because it was induced by fraud. In a traditional contract scenario, so long as the arbitration clause is not induced by fraud, the arbitrators can arbitrate the dispute, including whether the contract was induced by fraud, as contemplated under the FAA. However, when a contract is void *ab initio*, there is no arbitration cause-it is void. In other words, the Arbitration Clause in the Development Agreement never legally existed. Accordingly, the Court will grant summary judgment in favor of MBPI.

### *Conclusion*

For the foregoing reasons, the Court will grant MBPI's Motion for Summary Judgment and deny KAR's Motion for Summary Judgment to Compel Arbitration.

An Order consistent with this Opinion will be entered.

---

**7.** Until the Indian Gaming Commission ("IGC") came into existence and began operation, contracts were properly approved according to the requirements of 25 U.S.C. § 81, including contracts which were later subject to regulation under 25 U.S.C. § 2711 after the IGC was operational. *See United States ex rel. Mosay v. Buffalo Bros. Mgmt. Inc.*, 20 F.3d 739 (7th Cir.1994).

**8.** KAR does cite Judge Posner's dicta in *Sokaogon Gaming Enter. Corp. v. Tushie–Montgomery Assocs., Inc.*, 86 F.3d 656, 659 (7th Cir.1996) ("Although the arbitration clause is contained in a contract that the tribe contends is illegal, the tribe rightly does not argue that the illegality of the contract infects the arbitration clause.") (citing *Prima Paint*, 388 U.S. at 403, 87 S.Ct. at 1805). The Court notes that the *Sokaogon* court did not address the issue at bar, and the *Sokaogon* dicta is not controlling authority. Thus, the Court is not persuaded by this single sentence in a case that is otherwise legally dissimilar to the case currently before the Court.