In the

# United States Court of Appeals

## For the Seventh Circuit

_____

Nos. 14-2150 & 14-2287

STIFEL, NICHOLAUS & COMPANY, INC.,
et al.,

*Plaintiffs-Appellees*,

and

GODFREY & KAHN,

*Plaintiff-Appellee/Cross-Appellant,*

*v.*

LAC DU FLAMBEAU BAND OF LAKE
SUPERIOR CHIPPEWA INDIANS and LAKE
OF THE TORCHES ECONOMIC DEVELOPMENT
CORPORATION,

*Defendants-Appellants/Cross-Appellees*.

_____

Appeal from the United States District Court for the
Western District of Wisconsin.
No. 3:13-cv-00372-wmc — **William M. Conley**, *Chief Judge.*

_____

ARGUED APRIL 9, 2015 — DECIDED NOVEMBER 24, 2015

_____

Before FLAUM, RIPPLE, and WILLIAMS, *Circuit Judges.*

RIPPLE, *Circuit Judge*. The current appeal is the most recent in a series of lawsuits that have arisen over the sale of bonds by the Lake of the Torches Economic Development Corporation ("the Corporation"), a corporation wholly owned by the Lac du Flambeau Band of Lake Superior Chippewa Indians ("the Tribe") (collectively "the Tribal Entities"). In a prior action in this court, Wells Fargo Bank ("Wells Fargo") had alleged that the Corporation had breached a bond indenture and, as trustee for the bondholders, had sought "the appointment of a receiver to manage the trust security on behalf of the bondholder." *Wells Fargo Bank v. Lake of the Torches Econ. Dev. Corp.*, 658 F.3d 684, 686 (7th Cir. 2011). We held that the bond indenture constituted an unapproved management contract under the Indian Gaming Regulatory Act ("the IGRA"), 25 U.S.C. §§ 2701–2721, and was therefore void. Following our decision, the validity of other bond-related documents continued to be litigated in other courts.

After more than three years of litigating in federal and state court, the Tribal Entities instituted a tribal court action in April 2013 seeking a declaration that the bonds are invalid under the IGRA as well as tribal law. The action currently before the court represents the efforts of the non-tribal parties to put an end to the tribal court action. Those non-tribal parties are: Stifel, Nicolaus & Company, Inc., the initial purchaser of the bonds; Stifel, Nicolaus & Company's parent corporation, Stifel Financial Corporation (collectively "Stifel"); LDF Acquisition, LLC ("LDF"), a special purpose vehicle created by the predecessor of Saybrook Fund Investors, LLC (collectively "Saybrook") for the purpose of pur-

chasing the bonds; Wells Fargo;[1] and Godfrey & Kahn S.C. ("Godfrey"), counsel to the Corporation and bond counsel to the transaction. Specifically, the Financial Entities and Godfrey sought an injunction in the Western District of Wisconsin to preclude the Tribal Entities from pursuing their tribal court action.

Following the submission of evidence and a hearing, the district court preliminarily enjoined the Tribal Entities from proceeding against the Financial Entities, but allowed the tribal action to proceed against Godfrey. The Tribal Entities appealed the district court's grant of the injunction, and Godfrey cross-appealed the district court's denial of the same.

We now affirm in part, and reverse and remand in part. We agree with the district court that tribal court exhaustion was not required. We also concur that the Tribal Entities effectuated a valid waiver of their sovereign immunity, and, therefore, the action against them may proceed. Finally, we agree that the Financial Entities have established a substantial likelihood of succeeding in their challenge to the tribal court's jurisdiction; we conclude, therefore, that the district court did not abuse its discretion in enjoining the tribal court action against the Financial Entities.

With respect to Godfrey's cross-appeal, we conclude that the district court made several errors of law in assessing whether Godfrey had established a likelihood of success on the merits. With respect to Godfrey's cross-appeal, therefore,

---

[1] Stifel, LDF, Saybrook, and Wells Fargo are referred to collectively as "the Financial Entities."

we reverse the judgment of the district court and remand for further proceedings.

## I

## BACKGROUND

### A. Facts

**1.**

The Corporation is chartered under tribal law to own and operate the Lake of the Torches Resort Casino ("the Casino"). The Casino is a gaming facility located on tribal lands in northern Wisconsin and is operated pursuant to a tribal-state compact with the State of Wisconsin.

In 2007, "the Tribe decided to diversify its operations by investing in a project to build a riverboat casino, hotel and bed and breakfast in Natchez, Mississippi. In order to secure funding for that investment and to refinance $27.8 million of existing debt, [the Corporation] issued $50 million in taxable gaming revenue bonds" in January 2008. *Wells Fargo Bank*, 658 F.3d at 688–89. Godfrey, in its capacity as counsel to the Corporation and bond counsel for the transaction, issued two opinion letters as to the meaning of several bond-related documents and the legality of the bond transaction.

The bonds were sold to a brokerage firm, Stifel, and then resold to LDF. "The bonds, which were secured by the revenues and related assets of the Casino, were accompanied by a trust indenture ('the Indenture') naming Wells Fargo as trustee." *Id.* at 689 (footnote omitted). The Indenture included numerous provisions "that vested in Wells Fargo and the bondholder the power to ensure that [the Corporation] satisfied its repayment obligations." *Id.* This power included

oversight of Casino revenues, which the Corporation was required to deposit in an account controlled by Wells Fargo.

Along with the Indenture, there were several other documents relevant to the transaction: the Specimen Bond,[2] a Bond Purchase Agreement,[3] a resolution related to the issuance of the bonds ("the Bond Resolution"),[4] a Tribal Resolution,[5] and opinion letters by Godfrey[6] (collectively "the Bond Documents"). Several of these documents contain (1) waivers of sovereign immunity on behalf of the Tribal Entities; (2) forum selection clauses designating the United States District Court for the Western District of Wisconsin (or, alternatively, the courts of Wisconsin) as the exclusive forum for disputes concerning the bond transaction; and (3) choice-of-law clauses designating the law of Wisconsin as the law according to which the documents were to be construed and disputes were to be resolved.

The Natchez investment proved to be less lucrative than expected, and the Tribe had trouble meeting its bond obligations. In October 2009, the Tribe elected a new governing council that had campaigned on a pledge to repudiate the bonds. The Corporation eventually repudiated its obligations under the bonds and refused to repay the $46,615,000 remaining principal or the interest.

---

[2] R.1-1.

[3] R.1-3.

[4] R.1-5.

[5] R.1-10.

[6] R.99-9, 99-10.

**2.**

When the Corporation repudiated the bonds, Wells Fargo brought an initial action in federal district court to enforce the Indenture. The district court, however, dismissed the action for lack of subject matter jurisdiction. It believed that several provisions of the Indenture "provide[d] Wells Fargo and Saybrook with significant authority to set up working policy for the Casino's operations." *Id.* at 690. As such, the Indenture constituted a management contract under the IGRA and was void because it had not been submitted to the Indian Gaming Regulatory Commission ("Commission") for approval. *See id.* at 691. Moreover, "[b]ecause unapproved management contracts are void, the waiver of sovereign immunity contained in the Indenture also was void and the district court was without jurisdiction. Consequently, it dismissed the case." *Id.*

The district court subsequently denied Wells Fargo's motion to amend its complaint to assert claims based on other documents in the bond transaction, such as the bond itself. According to the district court, the other documents on which Wells Fargo sought to rely were "collateral agreements within the meaning of Commission regulations and, in the view of the district court, [we]re therefore also void." *Id.* at 692 (internal quotation marks omitted).

On appeal, we affirmed the district court's judgment that the Indenture was void as an unapproved management contract. We determined, however, that the district court's conclusion—that the other documents related to the bond transaction also were void—was premature:

> It is not immediately apparent that the waivers contained in the documents attached to the proffered amended complaint, when read separately or together, ought to be construed as dependent on the validity of the waiver in the Indenture and that they do not make clear the Corporation's intent to render itself amenable to suit for legal and equitable claims in connection with the bond transaction.

*Id.* at 701. We "conclude[d] that the district court should have permitted Wells Fargo leave to file an amended complaint to the extent that it presented claims for legal and equitable relief in connection with the bond transaction on its own behalf and on behalf of the bondholder." *Id.* at 702. We also were mindful, however, that there was a question whether Wells Fargo could seek that relief now that the Indenture was void. Thus, the district court would have to "address whether Wells Fargo's standing to seek such relief on behalf of the bondholder survives the voiding of the Indenture." *Id.* We instructed that, after determining the standing issue, the district court "should proceed to address whether the transactional documents, taken alone or together, evince an intent on the part of the Corporation to waive sovereign immunity with respect to claims by Wells Fargo on its own behalf and, if it has standing to do so, on behalf of the bondholder." *Id.*

On remand, Wells Fargo was unsuccessful in crafting a complaint that named all of the real parties in interest and also preserved diversity of citizenship. It therefore moved to dismiss its complaint voluntarily on April 9, 2012.

**3.**

Prior to Wells Fargo's voluntary dismissal of the remanded action, Saybrook had filed a twenty-four-count complaint against the Corporation, Stifel, and Godfrey in Waukesha County Circuit Court, in which it asserted a breach of bond claim against the Corporation and various alternative claims against the other defendants. The language of the Bond Documents, however, allowed the parties to bring suit against the Tribal Entities in state court only in the event that the District Court for the Western District of Wisconsin failed to exercise jurisdiction.[7] Consequently, on the same day that Wells Fargo voluntarily dismissed the remanded federal action, Saybrook filed a complaint in federal district court ("Saybrook federal action") for the purpose of obtaining the court's ruling on its subject matter jurisdiction. *See Saybrook Tax Exempt Investors v. Lake of the Torches Econ. Dev. Corp.*, 929 F. Supp. 2d 859, 860 (W.D. Wis. 2013). The state action was stayed pending the federal court's determination of its jurisdiction, and the state court entered an order (agreed upon by the parties) extending the defendants' deadlines for answering or responding to the state court complaint until forty-five days after the district court made a

---

[7] Specifically, the Specimen Bond provided that "[t]he Corporation expressly submits to and consents to the jurisdiction of the United States District Court for the Western District of Wisconsin (including all federal courts to which decisions of the Federal District Court for the Western District of Wisconsin may be appealed), and, *in the event (but only in the event) the said federal court fails to exercise jurisdiction*, the courts of the State of Wisconsin… ." R.1-1 at 6 (emphasis added).

determination as to its jurisdiction in the Saybrook federal action.

On March 11, 2013, the District Court for the Western District of Wisconsin determined that Saybrook's claims were for breach of the bond and therefore did not raise a federal question. The court also believed that it was unlikely that there was diversity of citizenship, but it required proof of the plaintiffs' citizenship in order to completely rule out diversity of citizenship as a basis for subject matter jurisdiction. *Id.* Following the submission of supplemental affidavits establishing a lack of complete diversity, the district court dismissed the Saybrook federal action without prejudice on April 1, 2013.

**4.**

Following the district court's March 11 ruling in the Saybrook federal action, the Tribe amended its tribal code to expand the jurisdiction of its own tribal court. Prior to the amendment, the tribal code provided that the tribal court had jurisdiction over "[a]ll matters which the Tribal Council of the Lac du Flambeau Band of Lake Superior Chippewa invests, by appropriate ordinance, the Court with jurisdiction; [and] [a]ll actions brought under the provisions of this Code."[8] After the amendment, the tribal court's jurisdiction extended to "all cases and controversies, both criminal and civil, in law or in equity, arising under the Constitution, laws, customs, and traditions of the Lac du Flambeau Band of Lake Superior Ojibwe, including…cases in which the

---

[8] R.1-12 at 7.

Tribe, or its officials and employees shall be a party… ."[9] The code was further amended to provide for the selection of a "Judge Pro Tempore" under certain circumstances.[10] Most pertinent to the present action, the amendment allowed "[t]he Lac du Flambeau Tribal Council [to] appoint Judges Pro Tempore by majority vote…[t]o fill the role of a standing Trial Judge in any case to which the Tribe or any agency or enterprise of the Tribe is a party and an opposing party is a non-member of the Tribe."[11]

### 5.

On April 25, 2013, the Tribal Entities filed suit in tribal court against Saybrook, Wells Fargo, Stifel, and Godfrey seeking a declaration that all bond-related documents were void under the IGRA and under tribal law. The Tribe appointed as Judge Pro Tempore Professor Matthew L.M. Fletcher, a professor of Indian law from Michigan State University College of Law. The Financial Entities and Godfrey responded to the action on May 24, 2013, by filing motions to dismiss, which contested the jurisdiction of the tribal court. These motions were denied by the tribal court in an opinion issued on August 27, 2013.

Following the filing of their tribal court action, the Tribal Entities moved to stay the state action in Waukesha County Circuit Court and to hold an inter-jurisdictional conference with the tribal court under *Teague v. Bad River Band of Lake*

---

[9] R.1-13 at 7.

[10] *See id.* at 8.

[11] *Id.*

*Superior Tribe of the Chippewa Indians*, 612 N.W.2d 709 (Wis. 2000).[12] The state court denied that motion, and the state appellate court denied the Tribal Entities an interlocutory appeal.

**B. District Court Proceedings**

On the same day that the Financial Entities and Godfrey filed their motions to dismiss the tribal court action, they also instituted this action in the District Court for the Western District of Wisconsin. They sought a ruling that the tribal court did not have jurisdiction over them and moved for a preliminary injunction to prevent the tribal court action from proceeding.

Following extensive briefing and a hearing, the district court ruled on the Financial Entities' and Godfrey's motion. Before it turned to the four-factor analysis for preliminary injunctions, however, the court addressed two threshold issues raised by the Tribal Entities: sovereign immunity and tribal exhaustion.

**1.**

With respect to the waivers of sovereign immunity in the Bond Documents, the district court agreed with the Tribal Entities that several of the Bond Documents were unap-

---

[12] In *Teague v. Bad River Band of Lake Superior Tribe of the Chippewa Indians*, 612 N.W.2d 709, 719 (Wis. 2000), the Supreme Court of Wisconsin concluded that, when there are concurrent state and tribal actions, as a matter of comity, the two courts should confer for purposes of allocating jurisdiction between the two sovereigns.

proved management contracts under the IGRA and, there-fore, that both the documents and the waivers were void. The district court determined, however, that there were at least two Bond Documents—the Tribal Resolution and the Bond Resolution—that were *not* management contracts un-der the IGRA, and *did* contain clear waivers of the Tribe's sovereign immunity. It concluded, therefore, that the Tribal Entities had waived their sovereign immunity.

The court then turned to the second threshold question—exhaustion of tribal remedies. Guided by this court's deci-sion in *Altheimer & Gray v. Sioux Manufacturing Corp.*, 983 F.2d 803 (7th Cir. 1993), the court stated that it must look to the circumstances of the case "'to determine whether the is-sue in dispute is truly a reservation affair entitled to the ex-haustion doctrine.'"[13] The court explained that,

> [a]s in *Altheimer*, the Tribe and the Corporation alike agreed to litigate disputes involving the Bond Documents or the Bond Transaction, like this one over enforcement of the provisions of the Bonds themselves, in Wisconsin's federal or state courts, and they agreed that the law of Wisconsin should apply to such litigation. In the words of the *Altheimer* court, by doing so, the defendants apparently "wished to avoid characterization of the contract as a reservation affair by actively seeking the federal forum."[14]

---

[13] R.175 at 19 (quoting *Altheimer & Gray v. Sioux Mfg. Corp.*, 983 F.2d 803, 815 (7th Cir. 1993)).

[14] *Id.* at 19–20 (quoting *Altheimer & Gray*, 983 F.2d at 815).

The court therefore held that the Financial Entities and God-frey did not have to exhaust tribal court remedies with re-spect to disputes regarding the Bond Documents and Trans-action.

### 2.

Proceeding to the merits, the court observed that the Fi-nancial Entities and Godfrey bore the burden of demonstrat-ing that: (1) they have a reasonable likelihood of success on the merits; (2) they have no adequate remedy at law; and (3) they will suffer irreparable harm without injunctive relief. If they met this burden, then they also would have to establish that the harm they would suffer outweighed any harm the Tribal Entities would suffer and that the preliminary injunc-tion would not harm the public interest.

With respect to the Financial Entities' motion for injunc-tive relief, the court believed that the merits inquiry was governed by the Supreme Court's decision in *Montana v. United States*, 450 U.S. 544 (1981). The court explained that *Montana* established the general presumption against tribal court jurisdiction over nonmembers as well as two excep-tions to the presumption. First, tribes "may regulate, through taxation, licensing, or other means, the activities of nonmembers who enter consensual relationships with the tribe or its members, through commercial dealing, contracts, leases, or other arrangements."[15] According to the court, the Supreme Court had made clear that the focus of the first *Montana* exception was on nonmember conduct *on Indian*

---

[15] *Id.* at 26 (quoting *Montana v. United States*, 450 U.S. 544, 565 (1981)).

*land* and that "the touchstone" of the *Montana* exceptions was "the tribe's interests in protecting internal relations and self-governance."[16] The district court observed that the Financial Entities' on-reservation conduct had been "minimal, particularly with respect to Saybrook."[17] Although, with respect to Stifel, "the question [wa]s arguably closer," nevertheless, there was "no evidence presented that any *negotiations* with respect to the Bond Transaction or Documents took place on tribal land."[18] "In the end," the court noted, the Tribal Entities only had pointed to "the mere fact of a commercial relationship" that did not implicate the Tribe's sovereign interests.[19] The district court concluded "that this relationship alone, without more, [wa]s likely not enough" to support tribal court jurisdiction.[20]

Focusing on the second *Montana* exception, the district court noted that this exception is limited to non-Indians' conduct on reservation land. The tribal action at issue, however, did not seek to regulate the Financial Entities' conduct on reservation land. Moreover, this exception "was effectively intended 'to protect tribal self-government or to control internal relations.'"[21] Because paying the bonds would not jeopardize "the [T]ribe's right to *self-governance*,"[22] the tribal

---

[16] *Id.* at 28.

[17] *Id.* at 29.

[18] *Id.*

[19] *Id.* at 30.

[20] *Id.*

[21] *Id.* at 32 (quoting *Strate v. A-1 Contractors*, 520 U.S. 438, 459 (1997)).

[22] *Id.* at 33.

court action did not fall within the second *Montana* exception.

Having determined that the Financial Entities were likely to prevail on their claim that the tribal court lacked jurisdiction over them, the district court proceeded to the other preliminary-injunction factors. It found that the Financial Entities would suffer irreparable harm if they were "forced to litigate in two forums, expending significant effort and resources," were "deprived of the benefits of the forum for which they expressly contracted," and were "forced to litigate before…a court that likely lacks jurisdiction over them."[23] The district court similarly found that the balance of the harms and the public interest weighed in favor of issuing the injunction. The court rejected the notion that "entry of an injunction w[ould] undercut the autonomy both of the Tribe, as a sovereign nation, and of the state court."[24] The court explained that "[t]o enforce the various waivers…is not to undercut the autonomy of a sovereign nation; it is to hold the Tribe and the Corporation to the terms to which they agreed when entering into the Bond Transaction."[25] The district court, therefore, granted the Financial Entities' motion for a preliminary injunction.

---

[23] *Id.* at 49.

[24] *Id.* at 50.

[25] *Id.*

**3.**

With regard to Godfrey, however, the district court reached a different conclusion. For purposes of the preliminary-injunction proceedings, Godfrey did not contest the tribal court's jurisdiction under *Montana*; rather, it based its challenge on the forum selection clauses found in the Bond Documents.[26] Because Godfrey's forum-selection-clause argument was based in state contract law, the district court determined that it did not have subject matter jurisdiction over Godfrey's action. Moreover, although the court could have exercised supplemental jurisdiction over Godfrey's claim pursuant to 28 U.S.C. § 1367(a), the court was disinclined to do so because, it determined, it likely would resolve the Financial Entities' federal claims without a full trial on the merits. Finally, the district court continued, even if it were to ignore the jurisdictional concerns, Godfrey had not established a substantial likelihood of success on the merits. Most troubling to the district court was that the Bond Document on which Godfrey relied most heavily—the Tribal Agreement—contained provisions that rendered it a "management contract" under the IGRA. Although other documents, such as the Specimen Bond, did not raise those concerns, the Specimen Bond's forum selection clause applied only to the

---

[26] In particular, Godfrey stipulated that it would "not contend in connection with the motion for a preliminary injunction in this action that the Tribal Court does not have jurisdiction over it under *Montana v. United States*, 450 U.S. 544 (1981)." R.131 at 2. This stipulation was solely "for the purposes of the motion for preliminary injunction in this action only." *Id.* at 1. The stipulation, Godfrey made clear, did not prevent it from challenging the Tribal Court's jurisdiction over it "in light of the forum selection provisions contained in" the various Bond Documents involved in the parties' transaction. *Id.* at 2.

Corporation and not the Tribe. Therefore, the district court concluded that Godfrey was likely to enjoy "partial success [on the merits] at best."[27] Accordingly, it denied Godfrey's motion for a preliminary injunction.

Following the district court's ruling, the Tribal Entities appealed the district court's order granting a preliminary injunction to the Financial Entities, and Godfrey filed a cross-appeal challenging the district court's denial of its motion for a preliminary injunction.[28]

## II

## DISCUSSION

Before we turn to the propriety of injunctive relief, we, like the district court, must consider whether the parties' dispute is properly before us; that is, we must address the threshold issue of whether the district court should have deferred to the tribal court under the tribal exhaustion rule. Because we agree with the district court that tribal exhaustion was not warranted under the circumstances presented here, we proceed to the second threshold issue: whether the Tribal Entities waived their sovereign immunity. We conclude that there was a valid waiver of sovereign immunity. Lastly, therefore, we consider whether the district court abused its discretion in granting the Financial Entities injunctive relief and in denying the same to Godfrey.

---

[27] R.175 at 47–48.

[28] The district court's jurisdiction was premised on 28 U.S.C. § 1331. Our jurisdiction is premised on 28 U.S.C. §§ 1291 and 1292(a)(1).

**A. Exhaustion**

The concept of federal court abstention in cases involving Indian tribes, known as the tribal exhaustion rule, "requires litigants, in some instances, to exhaust their remedies in tribal courts before seeking redress in federal courts." *Altheimer & Gray*, 983 F.2d at 812. It is not, however, "'a jurisdictional prerequisite,' but rather is 'a matter of comity.'" *Id.* at 813 (quoting *Iowa Mut. Ins. Co. v. LaPlante*, 480 U.S. 9, 16 n.8 (1987)). Relying on our decision in *Altheimer & Gray*, the district court determined that exhaustion of tribal remedies was not required here. We begin, therefore, with *Altheimer & Gray*.[29]


**1.**

In *Altheimer & Gray*, the Devils Lake Sioux Tribe had created the Sioux Manufacturing Corporation ("SMC") to manufacture and market certain clothing products. The Tribe then negotiated with Medical Supplies & Technology, Inc. ("MST") to manufacture and market latex medical products on the reservation. A letter of intent contemplated that (1) SMC would purchase MST's assets, (2) MST would provide consulting services to SMC, and (3) SMC would pay MST a percentage of its profits. The letter also provided that the Tribe waived all sovereign immunity with respect to contractual disputes, that all of the documents were executed and would be interpreted according to the laws of Illinois,

---

[29] We review the district court's exhaustion ruling de novo. *See Garcia v. Akwesasne Hous. Auth.*, 268 F.3d 76, 79 (2d Cir. 2001).

and that all parties agreed to submit to the venue and jurisdiction of the federal and state courts located in the State of Illinois. After the letter of intent was signed, MST began business operations, but the closing of the transaction never took place. MST later ceased operations within the reservation and sued SMC in Illinois state court for breach of contract. MST's law firm, Altheimer & Gray, also filed suit seeking its fees for the negotiations. SMC removed the action to district court and moved for summary judgment on the ground that the contract was null and void under 25 U.S.C. § 81, a statute that required contracts concerning Indian lands to be approved by the Secretary of the Interior. The district court entered judgment for SMC, and Altheimer & Gray appealed.

Before us, SMC urged that we affirm the judgment because, among other reasons, Altheimer & Gray had failed to exhaust its tribal court remedies. We determined, however, that tribal exhaustion was not required. First, it was not clear that tribal exhaustion applied in the absence of a first-filed tribal action. *See Altheimer & Gray*, 983 F.2d at 814. Assuming applicability of that doctrine, however, the exhaustion inquiry was fact sensitive: exhaustion does not apply unless "the issue in dispute is truly a reservation affair." *Id*. Turning to the facts before us, we observed that, with respect to SMC and Altheimer & Gray,

> the principal dispute…concerns the application of a federal statute, 25 U.S.C. § 81, to the Letter of Intent. The other issues in this litigation concern a contract that both parties agreed would be interpreted under Illinois law. To apply the tribal exhaustion rule would place before the

> tribal court a dispute that must be resolved by
> laws of distant jurisdictions.

*Id.* Although the choice of law provision did not "foreclose application of the tribal exhaustion rule," this fact did distinguish the case then before us from cases in which the Supreme Court had required exhaustion. *Id.*

"*More important*[]," however, than the presence of a choice of law provision or a first-filed tribal action was the fact that "the application of the tribal exhaustion rule would not serve the policies" that the Supreme Court had articulated in *Iowa Mutual Insurance Co.*, 480 U.S. 9, and *National Farmers Union Insurance Cos. v. Crow Tribe of Indians*, 471 U.S. 845 (1985). *Altheimer & Gray*, 983 F.2d at 814–15 (emphasis added). In these cases, "the Supreme Court was concerned with implementing Congress's policy of tribal self-government. The Court feared that 'unconditional access to the federal forum would place it in direct competition with the tribal courts, thereby impairing the latter's authority over reservation affairs.'" *Id.* at 815 (quoting *Iowa Mutual Insurance Co.*, 480 U.S. at 16). This was not the case in *Altheimer & Gray*, where "the tribal entity wished to avoid characterization of the contract as a reservation affair by actively seeking the federal forum." *Id.* We noted that,

> [i]n the Letter of Intent, Sioux Manufacturing
> Corporation explicitly agreed to submit to the
> venue and jurisdiction of federal and state
> courts located in Illinois. *To refuse enforcement of
> this routine contract provision would be to under-
> cut the Tribe's self-government and self-
> determination.* The Tribe created SMC to en-
> hance employment opportunities on the reser-

vation. As the Ninth Circuit recognized, economic independence is the foundation of a tribe's self-determination. If contracting parties cannot trust the validity of choice of law and venue provisions, SMC may well find itself unable to compete and the Tribe's efforts to improve the reservation's economy may come to naught. We therefore affirm the district court's denial of SMC's motion for a stay of proceedings based on the tribal exhaustion rule.

*Id.* (emphasis added).

**2.**

The Tribal Entities maintain that *Altheimer & Gray* is distinguishable in several respects. According to the Tribal Entities, the rule articulated in *Altheimer & Gray*—that the exhaustion rule does not apply when a non-tribal forum has been designated by contract—is applicable only to situations where no tribal action is pending.

We cannot reconcile this argument with our approach in *Altheimer & Gray*. In that case, we noted that there was a split of authority as to whether exhaustion was required when there was no pending tribal case. Nevertheless, we assumed that the tribal exhaustion doctrine applied in both circumstances—when there was a tribal action pending and when there was not. Assuming the general applicability of the tribal exhaustion rule, therefore, we went on to consider whether tribal exhaustion was appropriate under the facts presented. In doing so, we drew on the Supreme Court's

discussions of *tribal* exhaustion in both *Iowa Mutual Insurance Co.* and *National Farmers Union Ins. Cos.*—cases in which there were competing tribal actions. Consequently, our reasoning in *Altheimer & Gray* is not limited to situations in which there is no competing tribal proceeding.

The Tribal Entities also contend that, unlike in *Altheimer & Gray*, the present action "raises significant issues of tribal law."[30] In the tribal action, the Tribal Entities seek to void the Bond Documents under tribal law, the IGRA, and the tribal constitution.[31] The central issue, however, is whether the Bond Documents constitute management contracts under the IGRA. If they are not management contracts, then the forum selection and choice-of-law clauses require that any disputes related to the bonds be resolved in Wisconsin courts and be governed by Wisconsin law. If they are management contracts, then, following this court's decision in *Wells Fargo*, they are void, and the court need not reach the question of their validity under tribal law. Thus, as in *Altheimer & Gray*, "the principal dispute between the parties concerns the application of a federal statute." 983 F.2d at 814.

Finally, the Tribal Entities maintain that the Bond Documents do not evince an explicit agreement to submit to the jurisdiction and venue of the Wisconsin courts. We do not believe this is a fair reading of the Bond Documents. Although the documents do not use identical language, the Tribal Agreement and the Specimen Bond both provide:

---

[30] Appellants' Br. 23.

[31] *See* R.1-14 at 28–32.

> The Corporation *expressly submits to and consents* to the jurisdiction of the United States District Court for the Western District of Wisconsin (including all federal courts to which decisions of the Federal District Court for the Western District of Wisconsin may be appealed), and, in the event (but only in the event) the said federal court fails to exercise jurisdiction, the courts of the State of Wisconsin wherein jurisdiction and venue are otherwise proper, for the adjudication of any dispute or controversy arising out of this Bond, the Indenture, or the Bond Resolution and including any amendment or supplement which may be made thereto, or to any transaction in connection therewith, *to the exclusion of the jurisdiction of any court of the Corporation.*[32]

Given that the Tribal Entities have consented to the jurisdiction of the Wisconsin courts (federal or state) *to the exclusion*

---

[32] R.1-1 at 6 (Specimen Bond) (emphasis added); R.1-9 at 6 (Tribal Agreement) (stating that "[t]he Tribe expressly submits to and consents to the jurisdiction of the United States District Court for the Western District of Wisconsin…to the exclusion of the jurisdiction of any court of the Tribe"). Moreover, the Tribal Resolution "resolve[s] that *all Legal Provisions in the Tribal Agreement are hereby approved*; more specifically and expressly, those by which the Tribe…consents to the jurisdiction: of the United States District Court for the Western District of Wisconsin…and the courts of the State of Wisconsin wherein jurisdiction and venue are otherwise proper." R.1-10 at 3 (emphasis added); *see also* R.1-5 at 4 (Bond Resolution) (stating that "more specifically and expressly the Corporation…consents to the jurisdiction of the United States District Court for the Western District of Wisconsin").

*of any tribal courts*, and given that the Tribal Entities do not suggest that *any* other courts have jurisdiction over bond-related disputes, these disputes *must be* resolved in the federal or state courts of Wisconsin.

### 3.

Alternatively, the Tribal Entities maintain that, assuming *Altheimer & Gray* governs the present dispute, it requires the Financial Entities to exhaust tribal remedies. According to the Tribal Entities, "the tribal-court action implicates…the validity of a fraudulently induced Bond Transaction executed in violation of both tribal and federal law, which, if enforced, will consume the tribal Casino's revenue and cripple the tribal government."[33] They point to several cases from other circuits in which, they maintain, the courts have required exhaustion under similar circumstances.

A number of the cases on which the Tribal Entities rely are readily distinguishable.[34] Others, arguably, are more fac-

---

[33] Appellants' Br. 25.

[34] For instance, *National Farmers Union Insurance Cos. v. Crow Tribe of Indians*, 471 U.S. 845 (1985), involved an insurance company's jurisdictional challenge to a tort suit brought by a tribal member in tribal court where the tribal court already had entered a default judgment. Unlike the present case, there was no contractual waiver of exhaustion or agreement to litigate in a non-tribal forum. Under those circumstances, the Court determined that, in light of congressional policies "supporting tribal self-government and self-determination," the insurance companies defending the action should have to exhaust tribal remedies. *Id.* at 856; *see also, e.g.*, *Davis v. Mille Lacs Band of Chippewa Indians*, 193 F.3d 990, 991–92 (8th Cir. 1999) (requiring tribal court exhaustion with respect to employment dispute between a member of the tribe and the tribe itself); *Basil Cook*

tually analogous to the circumstances at hand.[35] In any event, with the advent of *Altheimer & Gray*, the presence of a forum selection clause is dispositive of the exhaustion issue: "To refuse enforcement of this routine contract provision would be to undercut the Tribe's self-government and self-determination." 983 F.2d at 815; *see also Ninigret Dev. Corp. v. Narragansett Indian Wetuomuck Hous. Auth.*, 207 F.3d 21, 33 (1st Cir. 2000) (noting that, in *Altheimer & Gray*, the court

---

*Enters., Inc. v. St. Regis Mohawk Tribe*, 117 F.3d 61, 66 (2d Cir. 1997) (requiring exhaustion in an action brought by two members of the tribe against the tribe and tribal leaders with "virtually all the events giving rise to the litigation occur[ing] on reservation lands"); *United States ex rel. Kishell v. Turtle Mountain Hous. Auth.*, 816 F.2d 1273, 1276 (8th Cir. 1987) (requiring exhaustion in an action brought on behalf of the estate of an enrolled member of the tribe against a tribal entity concerning land situated within the reservation).

[35] The Tribal Entities, for example, rely on *Bruce H. Lien Co. v. Three Affiliated Tribes*, 93 F.3d 1412 (8th Cir. 1996). In that case, the Tribes had contracted with a nonmember company for the management of an on-reservation casino. The agreement between the parties included an "unequivocal[] waive[r of] their sovereign immunity" as well as a binding arbitration provision, and "[t]he District Court of North Dakota was the selected forum in which to bring an action for injunctive relief." *Id.* at 1417. When a disagreement arose between the parties, the management company filed a demand for binding arbitration, followed by the Tribes filing an action in tribal court in which they challenged the validity of the contract under tribal law. The Eighth Circuit concluded that the dispute concerned a matter related to reservation affairs requiring exhaustion of tribal remedies: "In this case many of the parties are Tribal entities or members and the dispute arises from Tribal governmental activity involving a project located within the borders of the reservation." *Id.* at 1420. The presence of the forum selection clause in the contract did not alter the analysis because "in the present situation the Tribes are challenging the very validity of the agreement containing language giving the Tribal Court limited jurisdiction." *Id.* at 1421.

held that "the tribal exhaustion doctrine did not apply to a forum-selection clause in a contract between a non-Indian corporation and an Indian manufacturing company"). Furthermore, the fact that a contract may have been procured by fraud does not negate the validity of a forum selection clause; instead, we look to whether "a forum selection clause…*itself* was procured by fraud." *Muzumdar v. Wellness Int'l Network, Ltd.*, 438 F.3d 759, 762 (7th Cir. 2006) (emphasis added);[36] *see also Rucker v. Oasis Legal Fin., L.L.C.*, 632 F.3d 1231, 1238 (11th Cir. 2011) (observing that "[a] forum selection clause is viewed as a separate contract that is severable from the agreement in which it is contained," and, therefore, an allegation that the clause was a part of an agreement that was "void as [an] illegal gambling contract[] under Alabama law" did not affect the validity of the forum selection clause).[37]

---

[36] In their reply brief, the Tribal Entities acknowledge the holding in *Muzumdar v. Wellness International Network, Ltd.*, 438 F.3d 759 (7th Cir. 2006), but maintain that "reliance on *Muzumdar*…and cases concerning fraudulently induced contracts is misplaced" because those cases "concerned voidable contracts," whereas contracts that violate the IGRA are void *ab initio*. Appellants' Reply Br. 10 n.7. Even if there were merit to the Tribal Entities' void/voidable distinction, there are Bond Documents that contain valid waivers of sovereign immunity and designations of venue but do not constitute unapproved management contracts under the IGRA.

[37] Saybrook also maintains that exhaustion is not required because the tribal court's exercise of jurisdiction is in bad faith. *See* Saybrook's Br. 13. Because we conclude, on a different basis, that exhaustion is not required, we have no occasion to consider this argument.

In sum, we conclude that, consistent with the approach we adopted in *Altheimer & Gray*, exhaustion of tribal remedies is not required.

## B. Waiver of Sovereign Immunity

The Tribal Entities also maintain that the district court erred in holding that they had waived their sovereign immunity. They assert first that they were fraudulently induced to enter the bond transaction, and, therefore, any waivers contained in the Bond Documents are unenforceable. Second, they maintain that the Bond Documents did not waive their sovereign immunity. Finally, they contend that the documents containing the waivers are unapproved management contracts under the IGRA and, therefore, are not enforceable.

### 1. Fraudulent inducement

The Tribal Entities first fault the district court for considering the validity of the waivers of sovereign immunity in the Bond Documents without first considering whether the entire bond transaction was the product of fraudulent inducement. Because our analysis of this issue rests on the manner in which the issue of fraud was raised in the district court, we first set forth the procedural history of the Tribal Entities' fraud allegations.

#### a.

The Financial Entities filed their federal complaint on May 24, 2013, and filed their motion for injunctive relief on

the same day. In response, the Tribal Entities filed a motion to dismiss, in which they argued that the Bond Documents did not waive their sovereign immunity, and, even if they did, they nevertheless were unenforceable as unapproved management contracts under the IGRA. Notably, the Tribal Entities *did not argue* that the Bond Documents were unenforceable because they were the product of fraud. Similarly, the Tribal Entities' briefs in opposition to the motions for preliminary injunction and their reply brief in support of their motion to dismiss also made no argument with respect to fraud. On October 29, 2013, the district court denied the Tribal Entities' motion to dismiss. In the same order, the court set a hearing on the preliminary injunction for November 26, 2013.

The Tribal Entities filed an interlocutory appeal with respect to the denial of their motion to dismiss, which we dismissed for want of jurisdiction on January 13, 2014. On January 14, 2014, the Tribal Entities and Godfrey then requested that the district court "set a new date for the *previously scheduled and fully-briefed* hearing on plaintiffs' Motion for Preliminary Injunction, to occur as soon as possible after February 21, 2014."[38] The preliminary-injunction hearing was re-set for February 24, 2014. By request of the Tribal Entities, the date was then moved to March 14, 2014.

On February 12, 2014, the Tribal Entities filed a counterclaim, answer, and affirmative defenses. Among the defenses raised were that "[t]he Bond Transaction was procured by fraud and the Tribal [Entities] were fraudulently induced to enter into it and therefore should be relieved of any obliga-

---

[38] R.92 (emphasis added).

tion to perform thereunder."[39] Attached to the counterclaim was a transcript of a tribal meeting in which Kevin Shibilski, a representative of Stifel, allegedly made misrepresentations concerning the bond transaction.

On February 21, 2014, Saybrook moved the "Court *in limine* to exclude argument and evidence regarding alleged fraud as a defense to a preliminary injunction order."[40] Saybrook noted that the Tribal [Entities] had attached 377 pages of exhibits to their counterclaim, only fifteen of which had been mentioned in the preliminary-injunction briefing. According to Saybrook, "it [wa]s far too late…for the Tribal [Entities] to raise a highly fact-intensive affirmative defense of fraud rooted in allegations entirely unrelated to those that have been briefed to date."[41]

The court held a status conference on February 28, 2014, to address issues related to the preliminary-injunction hearing and the parties' motions in limine.[42] The court granted in part and denied in part Saybrook's motion in limine, allowing the "defendants…[to] raise fraud at the hearing, *but only to the extent they have proposed facts in response to plaintiffs' proposed findings of fact that support this claim*."[43] The ruling, however, was limited to the court's consideration of the motion for a preliminary injunction and did not preclude the Tribal Entities from raising fraud as a defense in the case.

---

[39] R.99 at 14.

[40] R.109 at 1.

[41] *Id.* at 4.

[42] *See* R.127 at 1.

[43] *Id.* at 2 (emphasis added).

Following the preliminary-injunction hearing, the parties filed evidence for the court to consider in making its ruling. The Tribal Entities designated portions of the deposition of David DeYoung, Stifel's designee under Federal Rule of Civil Procedure 30(b)(6), in which he had been asked to comment on allegedly fraudulent statements made by Shibilski during the tribal meeting.

### b.

With this background in mind, we turn to an assessment of the Tribal Entities' fraud-in-the-inducement argument. Specifically, they maintain that the district court erred "[b]y refusing to consider the effect of fraud on the purported waivers."[44] There is no question that fraud in the inducement bears on the enforceability of the contractual provisions. *See First Nat'l Bank & Trust Co. of Racine v. Notte*, 293 N.W.2d 530, 538 (Wis. 1980) (noting that fraud in the inducement renders a contract voidable). The court readily acknowledged this consideration and allowed the Tribal Entities to "plead[] fraud in the inducement as a defense in the case."[45] It did circumscribe, however, the Tribal Entities' presentation of evidence of fraud *with respect to the preliminary injunction*; for purposes of the preliminary injunction, the district court refused to expand the hearing beyond those issues which the Tribal Entities previously had raised and briefed.

---

[44] Appellants' Br. 43.

[45] R.127 at 2.

"District court judges, because of the very nature of the duties and responsibilities accompanying their position possess great authority to manage their caseload." *Gonzalez v. Ingersoll Mill. Mach. Co.*, 133 F.3d 1025, 1030 (7th Cir. 1998) (quoting *United States v. Reed*, 2 F.3d 1441, 1447 (7th Cir. 1993)). The Tribal Entities do not maintain that the district court abused its discretion in setting a briefing schedule or requiring the parties to submit proposed findings of fact. Moreover, they do not claim either that the Financial Entities impeded their ability to obtain evidence needed to raise the defense during the course of preliminary-injunction briefing or that the district court did not provide them with adequate time to develop their arguments. We must conclude, therefore, that the district court did not abuse its discretion in refusing to allow the Tribal Entities to expand the factual and legal parameters of the preliminary-injunction hearing.

### c.

Because the district court did not abuse its discretion in limiting the presentation of evidence and argument concerning the preliminary injunction, the Tribal Entities are limited to arguing that DeYoung's deposition testimony establishes that the Tribal Entities were fraudulently induced into entering the bond transaction. The evidence, however, does not support such a conclusion.

We have recognized that,

> [f]or claims of rescission based on fraud in the inducement, the Wisconsin Supreme Court follows the rule set forth in the *Restatement (Second) of Contracts*: "If a party's manifestation of

> assent is induced by either a fraudulent or a material misrepresentation by the other party upon which the recipient is justified in relying, the contract is voidable by the recipient."

*Archdiocese of Milwaukee v. Doe*, 743 F.3d 1101, 1105 (7th Cir. 2014) (quoting Restatement (Second) of Contracts § 164(1) (1981)). A fraud plaintiff bears the burden of proving these elements by clear and convincing evidence. *See Lundin v. Shimanski*, 368 N.W.2d 676, 681 (Wis. 1985).

DeYoung's deposition testimony, standing alone, does not satisfy the Tribal Entities' burden. First, DeYoung's testimony does not establish that Shibilski's statements were "fraudulent or [] material misrepresentation[s]." *Archdiocese of Milwaukee*, 743 F.3d at 1105. Although in his deposition, DeYoung seems to want to distance himself from Shibilski's statements, in most instances, he stops short of stating that Shibilski's statements were false. Second, the Tribal Entities point to *no* evidence in the record that they relied on these specific misstatements in approving the bond transaction, much less evidence that would establish their reliance by clear and convincing evidence.

### 2. Waiver language in the Bond Documents

The Tribal Entities also argue that the Bond Documents relied upon by the district court—the Tribal Resolution and Bond Resolution—do not contain valid waivers of sovereign immunity. Relying on *State of Wisconsin v. Baker*, 698 F.2d 1323 (7th Cir. 1983), the Tribal Entities further maintain that the Tribal and Bond Resolutions only approve waivers in other documents; they do not purport to be independent

waivers of sovereign immunity. Finally, even if they constitute valid waivers of sovereign immunity, they are not broad enough to encompass an action by the Financial Entities. We do not find any of these arguments persuasive.

As a preliminary matter, the Tribal Entities' suggestion that the district court believed that *only* two documents provided unequivocal waivers is incorrect. While noting that "[t]wo individual Bond Documents in particular *stand out* as providing an unequivocal, independent waiver of the Tribe's sovereign immunity,"[46] the district court mentioned several documents that "unambiguously state[] not only that defendants have waived sovereign immunity but also that they consent to jurisdiction in this court,"[47] including the Specimen Bond, the Bond Purchase Agreement, the Bond Resolution, and the Tribal Resolution.

Moreover, *Baker* does not support the Tribal Entities' assertion that the resolutions are ineffective as waivers of sovereign immunity. In *Baker*, the defendants, "in their capacity as members of the Band's governing board[,] adopted a resolution authorizing their attorneys of record to waive the Band's sovereign immunity to this suit." *Id.* at 1331. We held that this "resolution purport[ed] only to delegate to defendants' appellate attorneys the power to waive the Tribe's immunity to this suit" and that, based on the record before us, it did not appear "that defendants' attorneys ever exercised the power delegated to them." *Id.* Here, in contrast, the Resolutions do not authorize a future action that never occurred. Instead, the Resolutions affirmatively approve and

---

[46] R.175 at 14 (emphasis added).

[47] *Id.* at 9.

acknowledge actions that already have been taken, namely that the Tribe has "provide[d] a limited waiver of sovereign immunity from suit."[48] The distinction drawn in *Baker*, therefore, simply has no applicability here.

The Tribal Entities also maintain that, assuming the Resolutions can operate as waivers of sovereign immunity, the Resolutions do not waive sovereign immunity as to the Financial Entities. The Tribal Entities argue that when the Resolutions are strictly construed, *see Orff v. United States*, 545 U.S. 596, 601–02 (2005), they constitute a contract only with the Trustee, and only the Trustee can enforce its provisions.

The language of the Resolutions is not so limited. More than merely establishing a contract with the Trustee, the Bond Resolution acknowledged that the bonds were to be sold to Stifel, approved all of the legal provisions in the Bond Documents, and, provided "more specifically and expressly" that "the Corporation…waive[d] its immunity from suit…with respect to any dispute or controversy arising out of the Indenture, the Security Agreement, the Bond Placement Agreement, the Bonds, this Bond Resolution and including any amendment or supplement which may be made thereto, or to any transaction in connection therewith."[49] The waiver is written in the broadest terms and does not suggest any limitation as to litigating party.

---

[48] R.1-10 at 3.

[49] R.1-5 at 4.

### 3. Validity under the IGRA

Finally, the Tribal Entities argue that the waivers of sovereign immunity are unenforceable because the documents in which they appear are unapproved management contracts, which are void under the IGRA. They first note that, under the implementing regulations, "[t]he NICG must approve '*any*' agreement that 'provides for the management of *all or part* of a gaming operation.' 25 C.F.R. § 502.15."[50] They maintain that all the Bond Documents are part of the same transaction, and, therefore, they constitute a single management contract that rises or falls as one.[51] Because the Indenture is at the heart of the transaction, and because we have held that the Indenture is void under the IGRA, *see Wells Fargo Bank*, 658 F.3d at 702, the remainder of the Bond Documents also are void.

This argument, however, is foreclosed by our decision in *Wells Fargo*, 658 F.3d at 701. In that case, after we concluded that the Indenture was void as an unapproved management contract, we turned to the district court's determination that, because the various transactional documents were collateral to the Indenture and because they incorporated by reference the Indenture's terms, "the entire transaction, including all collateral agreements, required the Chairman's approval, and the bonds themselves were also management contracts subject to the Act's approval requirement." *Id.* We disagreed:

> We do not believe that this analysis can support the district court's decision. As our col-

---

[50] Appellants' Br. 48 (footnote omitted).

[51] *See also* Br. of Amicus Curiae Nat'l Indian Gaming Ass'n 5–6.

> leagues in the Second Circuit have held, a document collateral to a management contract "is subject to agency approval…only if it 'provides for the management of all or part of a gaming operation.'" *Catskill Dev.* [*L.L.C. v. Park Place Entertainment Corp.*], 547 F.3d [115, 130 (2d Cir. 2008)] (quoting 25 C.F.R. § 502.15). In our view, the mere reference to a related management contract does not render a collateral document subject to the Act's approval requirement.

*Id.* (footnote omitted). Thus, a document that is collateral to a management contract in the sense that is related does not require approval; it is only when that related agreement also provides for "the management of all or part of a gaming operation" that NIGC approval is required.

Alternatively, the Tribal Entities contend that agency practice dictates that we view the Bond Documents collectively. According to the Tribal Entities, had the Bond Documents been submitted for agency approval, the NIGC

> would have reviewed the entire set of Bond Documents together and considered them as a group to ensure that none conveyed management authority… .

> After reviewing the Bond Documents together, the NIGC would have issued a 'declination letter' that applied to *all* of the Documents, or would refuse to issue a declination letter concerning *any* of the documents.[52]

---

[52] Appellants' Br. 51–52.

"Under the NIGC's analysis," therefore, "even if an agreement is not a management contract, it becomes one if it is intertwined with, and dependent upon, other agreements that do provide for management."[53]

Again, however, we cannot reconcile this approach with our decision in *Wells Fargo*. In *Wells Fargo*, we observed that "a document collateral to a management contract is subject to agency approval…only if it provides for the management of all or part of a gaming operation." *Id.* (internal quotation marks omitted). The agency's contrary practice cannot take precedence over the unambiguous language of the regulation.[54]

---

[53] *Id.* at 52.

[54] *Bernard v. Casino Magic Corp.*, 293 F.3d 419 (8th Cir. 2002), does not suggest a different result. In that case, the parties (the tribe and Casino Magic) had submitted a consulting agreement to the NIGC for approval. The NIGC, however, had determined that the consulting agreement was not a management contract and therefore did not require approval from the NIGC: "While Casino Magic will be advising and consulting on many aspects of the gaming enterprise, pursuant to the Consulting Agreement the Tribe will retain ultimate control and direction of the casino operation." *Id.* at 421. Later, the Tribe and BNC National Bank entered into a Construction and Term Loan Agreement. Under the terms of the Agreement, BNC agreed to make advances to the Tribe conditioned upon Casino Magic's commitment to contribute to the loan; the Agreement also required that the Tribe "accept and comply with all of the recommendations made by the Consultant under the Consulting Agreement." *Id.* at 422 (internal quotation marks omitted). When litigation later arose, the tribe argued that the Construction and Term Loan Agreements, together with the Consulting Agreement, constituted an unapproved management contract that was void under the IGRA. The Eighth Circuit agreed; it stated: "The Tribe's ultimate authority…was effectively revoked by the terms of section 5.1(p) of the Construction and Term

Finally, the Tribal Entities contend that, even if the court considers the individual documents in isolation, they nevertheless each meet the definition of a management contract. Because each of the Bond Documents is void, the waivers of sovereign immunity contained in those documents also are void. Specifically, the Tribal Entities argue that the Tribal Resolution constitutes an unapproved management contract because it contains a "covenant[] not to replace key management of the Casino Facility without obtaining the requisite consent of the holders of the Bonds,"[55] similar to the one we found problematic in *Wells Fargo*. According to the Tribal Entities, this one provision is sufficient to transform the Tribal Resolution into a management contract for purposes of the IGRA. We disagree.

In *Wells Fargo*, a provision of the Indenture prohibited the Corporation from removing or replacing (or permitting the removal or replacement of) key management personnel at the Casino "without the consent of 51% of bondholders." 658 F.3d at 698. We noted that "[t]his requirement applie[d] to removal for *any* reason, thus potentially tying the hands of the Tribe to replace key officers even when sound management or even regulatory compliance concerns require their removal." *Id.* The language in the Tribal Resolution, however, is not as broad: The Tribal Resolution does not require bondholder approval to *remove* key management employees; it only requires bondholder approval for the choice of re-

---

Loan Agreement, which mandated the Tribe's compliance with Casino Magic's recommendations." *Id.* at 425. Here, the documents merely reference one another; the Tribal Entities do not point to any terms in one document that fundamentally alter language in another.

[55] R.1-10 at 3.

placements. Consequently, the Tribal Agreement does not "t[ie] the hands of the Tribe" in the same manner as the Indenture did.

Moreover, it was not the "remove and replace" provision in the Indenture, standing alone, that transformed it into a management contract under the IGRA. Rather, it was the numerous provisions for oversight[56] "taken together" that rendered the Indenture a management contract. *Id.* at 698–99.

Apart from the provision not to replace key personnel, the Tribal Entities do not point to any problematic provisions in the Tribal Resolution. Moreover, the Tribal Entities do not point to any problematic provisions in the Bond Resolution that would transform that document into a management contract.[57] Because the Tribal and Bond Resolutions are not void as unapproved management contracts and also contain waivers of sovereign immunity, the district court did not err in concluding that the Tribal Entities had waived their sovereign immunity.[58]

---

[56] These include: the direct deposit of the Casino's daily gross revenues into a trust account managed by Wells Fargo, a requirement that capital expenditures above a certain amount be approved by the bondholders, and the appointment of an independent consultant (approved by the bondholder representative) in the event that the debt-service-coverage ratio fell below a stated level. *See Wells Fargo*, 658 F.3d at 698–99.

[57] Although the parties focus on the Tribal and Bond Resolutions, this also is true of the Specimen Bond.

[58] Because we conclude that the Tribal and Bond Resolutions were not void as unapproved management contracts, we need not address Saybrook's alternative contention that the voiding regulation, 25 C.F.R. § 533.7, is defective. *See* Saybrook's Br. 35–37.

## C. Tribal Court Jurisdiction

Because we conclude that tribal court exhaustion was not required and that the Tribal Entities waived their sovereign immunity, we can proceed to the substantive issue presented by the Tribal Entities' appeal: whether the district court properly enjoined the tribal court action because the tribal court lacked jurisdiction over the Financial Entities.

In *Atkinson Trading Co. v. Shirley*, 532 U.S. 645 (2001), the Supreme Court observed that "[t]ribal jurisdiction is limited: *For powers not expressly conferred upon them by federal statute or treaty*, Indian tribes must rely upon their retained or inherent sovereignty." *Id.* at 649–50 (emphasis added); *see also Atty's Process & Investigation Servs. v. Sac & Fox Tribe of the Miss. in Iowa*, 609 F.3d 927, 934 (8th Cir. 2010) ("Where, as here, tribal jurisdiction is not *specifically authorized by federal statute or treaty*, a tribe's adjudicatory authority must stem from its 'retained or inherent sovereignty.'" (emphasis added) (quoting *Atkinson Trading Co.*, 532 U.S. at 649–50)).[59]

---

[59] The Tribal Entities do assert that the tribal court has jurisdiction over the Financial Entities based on treaty rights. However, the Tribal Entities do not point to *any* treaty language that grants the Tribe authority over nonmembers, much less authority "expressly conferred," *Atkinson Trading Co. v. Shirley*, 532 U.S. 645, 649 (2001), or "specifically authorized," *Atty's Process & Investigation Servs. v. Sac & Fox Tribe of the Miss. in Iowa*, 609 F.3d 927, 934 (8th Cir. 2010). The sole record support for their claim that tribal court jurisdiction is rooted in treaty rights is a citation to an affidavit filed by John P. Bowes, Associate Professor of History at Eastern Kentucky University, who opines that "[e]vidence indicates that…the government also intended the Indians to have the right to exclude individuals from the reservation if they so desired." R.50 at 4 ¶11. In setting forth his opinion, Professor Bowes does not rely on treaty language, but on the statements of Commissioner Henry Gilbert made a

The scope of a tribe's "retained or inherent authority" was first articulated in *Montana v. United States*, 450 U.S. 544, 565 (1981): "Indian tribes retain inherent sovereign power to exercise some forms of civil jurisdiction over non-Indians on their reservations, even on non-Indian fee lands." Specifically, the Court in *Montana* set forth

> two narrow situations in which a tribe may exercise jurisdiction over nonmembers: (1) "[a] tribe may regulate, through taxation, licensing, or other means, the activities of nonmembers who enter consensual relationships with the tribe or its members, through commercial dealing, contracts, leases, or other arrangements"; and (2) "[a] tribe may also retain inherent power to exercise civil authority over the conduct of non-Indians on fee lands within its reservation when that conduct threatens or has some direct effect on the political integrity, the economic security, or the health or welfare of the tribe." *Id.* at 565, 566.

*Jackson v. Payday Fin., LLC*, 764 F.3d 765, 782 (7th Cir. 2014) (parallel citation omitted).

### 1.

As an initial matter, the Tribal Entities argue that *Montana* only applies to situations in which tribes attempt to

---

year after a treaty was ratified. This is not sufficient for us to conclude that the "tribe's adjudicatory authority" was "specifically authorized by federal…treaty." *Atty's Process & Investigation Servs.*, 609 F.3d at 934.

regulate nonmember conduct on non-Indian fee land, as opposed to tribal trust land.

The Tribal Entities' view cannot be squared with the Supreme Court's more recent cases, *Nevada v. Hicks*, 533 U.S. 353 (2001), and *Plains Commerce Bank v. Long Family Land & Cattle Co.*, 554 U.S. 316 (2008). In *Hicks*, the Supreme Court considered whether a tribal court had jurisdiction over a warden's allegedly tortious conduct while executing a search warrant on tribe-owned land within the reservation. The Supreme Court began its analysis with the general proposition that "Indian tribes' regulatory authority over nonmembers is governed by the principles set forth in *Montana*." *Hicks*, 533 U.S. at 358. It noted first, that, although "the non-Indian status of the land was central to the analysis in…*Montana*," that was not because "Indian ownership suspends the 'general proposition'…that 'the inherent sovereign powers of an Indian tribe do not extend to the activities of nonmembers of the tribe.'" *Id.* at 359. "The ownership status of land," the Court explained, "*is only one factor to consider* in determining whether regulation of the activities of nonmembers is 'necessary to protect tribal self-government or to control internal relations.'" *Id.* at 360 (emphasis added). "[T]he existence of tribal ownership," however, "is not alone enough to support regulatory jurisdiction over nonmembers." *Id.*

Moreover, more recently in *Plains Commerce Bank*, the Supreme Court reiterated that *Montana*'s "general rule restricts tribal authority over nonmember activities taking place on the reservation, and is particularly strong when the nonmember's activity occurs on land owned in fee simple by non-Indians—what we have called 'non-Indian fee land.'"

554 U.S. at 328 (quoting *Strate v. A-1 Contractors*, 520 U.S. 438, 446 (1997)). *Plains Commerce Bank*, therefore, leaves no doubt that *Montana* applies regardless of whether the actions take place on fee or non-fee land.[60] We therefore turn to the *Montana* exceptions.

**2.**

Looking to the first *Montana* exception, the Tribal Entities assert that the Financial Entities entered into a consensual relationship with the Tribe and engaged in on-reservation conduct that brings it within the jurisdiction of the tribal court. We made clear in *Jackson*, however, that *Plains Commerce Bank* "circumscribed" the already narrow *Montana* exceptions. *Jackson*, 764 F.3d at 782. We explained that a tribe's authority to regulate nonmember conduct "centers on the land": "'*Montana* and its progeny permit tribal regulation of nonmember *conduct inside* the reservation that implicates the tribe's sovereign interests.'" *Id.* (quoting *Plains Commerce Bank*, 554 U.S. at 327).

---

[60] The Tribal Entities point to the Ninth Circuit's decision in *Water Wheel Camp Recreational Area v. LaRance*, 642 F.3d 802 (9th Cir. 2011). In that case, the Ninth Circuit stated that "*Montana* limited the tribe's ability to exercise its power to exclude only as applied to regulation of non-Indians on non-Indian land, not on tribal land." *Id.* at 810. The court in *Water Wheel* acknowledged the Court's decisions in *Nevada v. Hicks*, 533 U.S. 353 (2001), and *Plains Commerce Bank v. Long Family Land & Cattle Co.*, 554 U.S. 316 (2008), but determined that *Hicks*'s holding was of "limited applicability," *Water Wheel Camp Recreational Area*, 642 F.3d at 813, and that *Plains Commerce Bank* does not speak to situations involving Indian land, *id.* at 811 n.6. We do not believe that these conclusions can be reconciled with the language that the Court employed in *Hicks* and *Plains Commerce Bank*.

The Tribal Entities submit that, in evaluating whether the tribal court has jurisdiction over the Financial Entities under the first *Montana* exception, the court need not limit its consideration to the on-reservation actions of the Financial Entities. This view, however, is at odds with *Plains Commerce Bank*, in which the Court observed "that the sovereignty that the Indian tribes retain is of a unique and limited character. *It centers on the land held by the tribe and on the tribal members within the reservation*." 554 U.S. at 327 (emphasis added) (citations omitted) (internal quotation marks omitted). The actions of nonmembers outside of the reservation do not implicate the Tribe's sovereignty.

Turning to on-reservation conduct, the Tribal Entities point to "multiple meetings," during which Stifel allegedly "misrepresented material terms of the Bond Transaction."[61] The first *Montana* exception, however, requires that a tribe's regulation of the nonmember, here the tribal court action, "have a nexus to the consensual relationship itself." *Atkinson Trading Co.*, 532 U.S. at 656. The tribal court action, however, does not seek to regulate any of Stifel's activities on the reservation. Rather, the tribal court action seeks to void each of the bond documents because they are unapproved management contracts under the IGRA; it also seeks to void the Tribal Agreement and Tribal Resolution "because [they] w[ere] not approved by a referendum vote of the members of the Tribe or the Secretary of the Interior as required by the

---

[61] Appellants' Br. 34. Saybrook's conduct has an even more tenuous connection to the reservation. Saybrook's representative came onto the reservation only once for less than one day to gather information about the Casino.

Tribal Constitution."[62] Because the tribal court action does not seek redress for any of Stifel's consensual activities on tribal land, it does not fall within *Montana*'s first exception.

**3.**

Finally, the Tribal Entities argue that the tribal court has jurisdiction over the Financial Entities under the second *Montana* exception. According to the Tribal Entities, the bond transaction imperiled the Tribe's ability to provide services to its members. The Financial Entities' actions, therefore, "threaten[] or ha[ve] some direct effect on the political integrity, the economic security, or the health or welfare of the tribe" and provide a basis for tribal court jurisdiction. *Montana*, 450 U.S. at 566.

The Supreme Court discussed the second *Montana* exception in *Strate*, 520 U.S. at 458. The jurisdictional dispute in *Strate* arose from a vehicle collision between two individuals, Fredericks and Stockert, on a portion of a North Dakota state highway that ran through a reservation. Fredericks was not a member of the tribe, but was the widow of a deceased tribal member and had adult children who were tribal members. Stockert, also a nonmember, was driving a truck belonging to his employer, A-1 Contractors, a non-Indian-owned enterprise, which was under contract to perform landscaping within the reservation. Fredericks filed a personal injury action against Stockert and A-1, and Fredericks's children filed a loss-of-consortium claim in the same lawsuit. The tribal court ruled that it had jurisdiction, and

---

[62] R.1-14 (Tribal Court Statement of Claim) at 34.

Stockert and A-1 proceeded to federal court, where they sought a declaratory judgment that the tribal court lacked jurisdiction and also sought an injunction against further tribal court proceedings.

Before the Supreme Court, Fredericks asserted that the tribal court had jurisdiction pursuant to *Montana*'s second exception. The Supreme Court disagreed and explained:

> Undoubtedly, those who drive carelessly on a public highway running through a reservation endanger all in the vicinity, and surely jeopardize the safety of tribal members. *But if Montana's second exception requires no more, the exception would severely shrink the rule.* Again, cases cited in *Montana* indicate the character of the tribal interest the Court envisioned.
>
> …
>
> Read in isolation, the *Montana* rule's second exception can be misperceived. *Key to its proper application, however, is the Court's preface*: "Indian tribes retain their inherent power [*to punish tribal offenders*,] *to determine tribal membership, to regulate domestic relations among members, and to prescribe rules of inheritance for members… . But [a tribe's inherent power does not reach] beyond what is necessary to protect tribal self-government or to control internal relations*." Neither regulatory nor adjudicatory authority over the state highway accident at issue is needed to preserve "the right of reservation Indians to make their own laws and be ruled by them." The

> *Montana* rule, therefore, and not its exceptions,
> applies to this case.

*Id.* at 457–59 (citations omitted) (emphasis added); *see also Plains Commerce Bank*, 554 U.S. at 335 (observing that the regulations that it had approved of under *Montana* "all flow directly from these limited sovereign interests," namely "tribal governance and internal relations").

Here, the Tribal Entities do not point to any actions by the Financial Entities that threatened the right of tribal members "to make their own laws and be ruled by them." *Strate*, 520 U.S. at 459 (internal quotation marks omitted). Instead, they focus on the financial consequences of adhering to freely negotiated commercial transactions. The Tribal Entities essentially maintain that the second *Montana* exception applies whenever the economic effects of its commercial agreements affect a tribe's ability to provide services to its members. Like the arguments made by Fredericks in *Strate*, however, if the second exception were so broad, it would swallow the general rule. The only questions raised in the tribal court action are the enforceability of commercial agreements; it does not address any on-reservation actions by the Financial Entities, much less actions that threaten tribal self-rule.

In sum, the district court did not err in concluding that the Tribal Entities waived their sovereign immunity, that tribal exhaustion was not required, and that the Financial Entities had established a likelihood of success on the merits of their claim that the tribal court lacked jurisdiction over them. The district court, therefore, did not abuse its discretion in granting the Financial Entities a preliminary injunction as to the tribal court proceedings.

### III

We turn now to Godfrey's cross appeal. Before the district court, Godfrey conceded, for purposes of the court's consideration of the preliminary injunction only, that it could not fit within either of *Montana*'s exceptions. It argued nevertheless that the tribal court lacked jurisdiction over it based on the waiver provisions in the Bond Documents. Because Godfrey did not contend that "*federal law* ha[d] divested the tribal court of jurisdiction" over it,[63] the district court was not convinced that the general rule articulated in *National Farmers Union Insurance Cos. v. Crow Tribe of Indians*, 471 U.S. 845, 852 (1985)—that "[t]he question whether an Indian tribe retains the power to compel a non-Indian property owner to submit to the civil jurisdiction of a tribal court is one that must be answered by reference to federal law and is a 'federal question' under § 1331"—applied to Godfrey's claim.

Assuming that it lacked jurisdiction over Godfrey's claim, the district court turned to the question of supplemental jurisdiction under 28 U.S.C. § 1367(a). The district court observed that it was likely to dispose of the Financial Entities' federal claims before a complete trial on the merits. Consequently, the district court believed that "a presumption ar[ose] in favor of relinquishing jurisdiction" over Godfrey's supplemental claims.[64]

Finally, the court noted that, even if it "ignore[d] its jurisdictional concerns," Godfrey had not "yet established a

---

[63] R.175 at 34.

[64] *Id.* at 38.

substantial likelihood of success on the merits."[65] The court believed that, "Godfrey's case falter[ed] in too many ways for the court to conclude" that it had met this burden.[66] "In any event," the district court continued, "it ma[de] little sense to *exercise* supplemental jurisdiction over Godfrey's claims given that there is a reasonable likelihood that this court will not ultimately reach the merits of its claims."[67]

## A.

"We review questions of subject-matter jurisdiction de novo," *see Johnson v. Cypress Hill*, 641 F.3d 867, 873 (7th Cir. 2011), and we begin our jurisdictional analysis with the Supreme Court's decision in *National Farmers Union Insurance Cos.*, 471 U.S. 845. In that case, the Court considered the issue of whether a district court had jurisdiction to consider a tribal court's exercise of jurisdiction over a non-Indian's challenge to the tribal court's exercise of jurisdiction. Specifically, a tribal court had entered a default judgment against a state school district after it failed to respond to a complaint brought by a Crow Indian who had been struck by a motorcycle on school property. The school district and its insurer subsequently sought an injunction in federal district court against the tribal court proceedings, and the federal district court granted the injunction. Without reaching the merits of the underlying claim, the Ninth Circuit Court of Appeals reversed on the ground that "the District Court's exercise of

---

[65] *Id.* at 39.

[66] *Id.* at 48.

[67] *Id.*

jurisdiction could not be supported on any constitutional, statutory, or common-law ground." *Id.* at 849.

The Supreme Court reached a different conclusion. It explained that, while at one time Indian tribes had "exercised virtually unlimited power over their own members as well as those who were permitted to join their communities," now "the power of the Federal Government over the Indian tribes is plenary." *Id.* at 851. Consequently, "[f]ederal law, implemented by statute, by treaty, by administrative regulations, and by judicial decisions, provides significant protection for the individual, territorial, and political rights of the Indian tribes." *Id.* The Court, therefore, concluded that "[*t*]*he question whether an Indian tribe retains the power to compel a non-Indian property owner to submit to the civil jurisdiction of a tribal court* is one that must be answered by reference to federal law and *is a 'federal question' under § 1331*." *Id.* at 852 (emphasis added). Consequently, because the school district and its insurer "contend[ed] that federal law ha[d] divested the Tribe of this aspect of sovereignty, it is federal law on which they rel[ied] as a basis for the asserted right of freedom from Tribal Court interference. They have…filed an action 'arising under' federal law within the meaning of § 1331." *Id.* at 852–53.

The district court believed that "Godfrey's claims do not fall neatly within th[is] language," because Godfrey contends that state contract law, not federal law, "foreclosed [the Tribal Entities] from invoking tribal court jurisdiction."[68] We have been unable to locate, however, any authorities that support the distinction drawn by the district court.

---

[68] *Id.* at 34.

It is well recognized that "[f]ederal question jurisdiction…extends to…claims that the exercise of tribal authority impermissibly exceeds the federal common-law limits imposed by the Supreme Court." *Cohen's Handbook of Federal Indian Law* § 7.04(1)(a), p.613 & n.11 (Nell Jessup Newton ed., 2012) (citing *National Farmers Union Ins. Cos.*, 471 U.S. at 852–53). Indeed, in every case cited by the parties, the court determined that the scope of tribal court authority, *even where allegedly circumscribed by contract*, raised a federal question under § 1331. *See Gaming World Int'l, Ltd. v. White Earth Band of Chippewa Indians*, 317 F.3d 840, 848 (8th Cir. 2003) ("[*A*]*n action filed in order to avoid tribal court jurisdiction necessarily asserts federal law*. It is well established that the scope of tribal court jurisdiction is a matter of federal law."(emphasis added) (citation omitted)); *Ninigret Dev. Corp. v. Narraganset Indian Wetuomuck Hous. Auth.*, 207 F.3d 21, 28 (1st Cir. 2000) (holding, in the context of dispute in which tribe's adjudicative authority allegedly was limited by contract, that "'federal courts have authority to determine, as a matter "arising under" federal law,' the limits of a tribal court's jurisdiction" and "[t]he fact that a plaintiff's claims are not premised on federal law does not alter this result" (quoting *El Paso Natural Gas Co. v. Neztsosie*, 526 U.S. 473, 483 (1999))); *Bruce H. Lien Co. v. Three Affiliated Tribes*, 93 F.3d 1412, 1421–22 (8th Cir. 1996) (noting that among the "aspects of the dispute" that raised a federal question was the fact that "this case is being directed to the Tribal Court and exhaustion within that system" and further observing that "[t]he existence of tribal court jurisdiction itself presents a federal question within the scope of 28 U.S.C. § 1331"); *cf. Arizona Publ. Serv. Co. v. Aspaas*, 77 F.3d 1128, 1132 (9th Cir. 1996) (holding that, in context of a challenge to a tribe's legislative authority over

a non-Indian that was allegedly limited by contract, "a non-Indian challenging an exercise of tribal adjudicatory or legislative power states a claim that arises under federal law").[69]

Following the lead of our sister circuits, therefore, we agree with Godfrey that the district court had subject matter jurisdiction to consider Godfrey's challenge to tribal court jurisdiction, even though that challenge is rooted in the language of the Bond Documents. The district court therefore had subject matter jurisdiction over Godfrey's claim that the tribal court did not have jurisdiction to consider the merits of the claim against it.[70]

---

[69] In the present action, the district court discounted *Bruce H. Lien v. Three Affiliated Tribes*, 93 F.3d 1412 (8th Cir. 1996), and *Gaming World International, Ltd. v. White Earth Band of Chippewa Indians*, 317 F.3d 840 (8th Cir. 2003), because, "to the extent that the [Federal Arbitration Act]'s policy in favor of arbitration supported divestment of tribal jurisdiction, the defendants in both cases 'relied' on federal law 'as a basis for the asserted right of freedom from Tribal Court interference.'" R.175 at 36 (quoting *Nat'l Farmers Union Ins. Cos.*, 471 U.S. at 853). Two considerations, however, prevent us from embracing this distinction. First, neither *Bruce H. Lien* nor *Gaming World International* rests its analysis on the federal policy in favor of arbitration embodied in the Federal Arbitration Act. Second, the Federal Arbitration Act does not create federal jurisdiction: "As for jurisdiction over controversies touching arbitration, the [Federal Arbitration] Act does nothing, being something of an anomaly in the field of federal-court jurisdiction in bestowing no federal jurisdiction but rather requiring an independent jurisdictional basis." *Hall Street Assocs., L.L.C. v. Mattel, Inc.*, 552 U.S. 576, 581–82 (2008) (internal quotation marks omitted).

[70] Because the district court reached a contrary conclusion, it proceeded to consider whether it should exercise supplemental jurisdiction over Godfrey's claims under 28 U.S.C. § 1367(a). As noted previously, it was reluctant to do so given that the Financial Entities' claims likely would be resolved prior to trial. We need not address that conclusion.

**B.**

Although the district court did not identify a single, de-fining rule of law that precluded Godfrey from prevailing on the merits, it had an overall unease about granting prelimi-nary injunctive relief: "Godfrey's case falters in too many ways for the court to conclude [that] it has demonstrated the requisite likelihood of success."[71] Yet, our own study of the district court's explanation of Godfrey's claims reveals as well a disquietude with *the Tribal Entities' arguments*.[72] Now that we have rejected, definitively, the Tribal Entities' gen-eral contentions with respect to the tribal court's exercise of jurisdiction over all of the parties, including Godfrey, we turn to the one argument, unique to Godfrey, which we have not addressed: that Godfrey cannot invoke the forum selec-tion clauses in the Bond Documents because it is not a party to the bond transaction.[73]

---

[71] R.175 at 48.

[72] *See id.* at 41 (identifying "a number of flaws in [the Tribal Entities'] argument"); *id.* at 44 (noting that it "would be disinclined" to accept a position of the Tribal Entities); and *id.* at 46 (observing that the Tribal Entities' arguments for "void[ing] the Specimen Bond are somewhat less persuasive").

[73] Specifically, the Tribal Entities assert that "Godfrey's repeated reliance on [the forum selection] clauses is misplaced because it lacks standing to enforce them. Godfrey did not bargain for forum-selection rights in the Bond Documents *or* in the general-counsel contract that governed its re-lationship with the Tribal [Entities]. SA-1061-62." Appellants' Reply Br. 53. The Tribal Entities do not make any further argument or provide any additional explanation as to the effect or limitations of the general-counsel agreement on the Bond Documents. "We repeatedly have made clear that perfunctory and undeveloped arguments…are waived… ." *United States v. Berkowitz*, 927 F.2d 1376, 1384 (7th Cir. 1991). Moreover,

In *Adams v. Raintree Vacation Exchange, LLC*, 702 F.3d 436 (7th Cir. 2012), we reiterated that the test for whether a non-party to a contract can enforce—and be bound by—a forum selection clause "is whether the nonparty is 'closely related' to the suit." *Id.* at 439. Acknowledging that this is a "vague standard," we noted that "it can be decomposed into two reasonably precise principles": "'affiliation' and 'mutuality,'" either of which is sufficient to allow a nonparty to invoke a forum selection clause. *Id.*

The Tribal Entities do not maintain either that Godfrey lacks a close affiliation with them, the bond transaction, or the Bond Documents. Instead, they contend that "affiliation," as we employed that term in *Adams*, really means a "parent or subsidiary" relationship to the party of a contract, and Godfrey is not related either to the Tribal Entities or to the Financial Entities in this way.[74] The Tribal Entities, however, do not point to any case in which we have limited "affiliation" to entities that are only related through corporate structure.

---

the tribal court action does not seek to hold Godfrey liable for its advice or actions as general counsel, but only its actions as bond counsel. *See* R.1-14 at 10 ("Godfrey would retain $125,000 of Bond proceeds as its fee for serving as Bond Counsel"); *id.* at 14 ("Stifel and Godfrey Press the Tribe to Approve the Bond Transaction"); *id.* at 23 ("Godfrey incorrectly opined that the Bond Documents did not require NIGC approval."); *id.* at 29–34 (requesting relief in the form of a declaration that the Bond Documents and the bond transaction are void under Tribal law and under the IGRA). As explained above, the forum selection clauses in the Bond Documents are written in the broadest terms so as to encompass *any* dispute or controversy arising out of the bond transaction, including claims against Godfrey as bond counsel. *See supra* 34.

[74] Appellants' Reply Br. 54.

Similarly, with respect to "mutuality," the Tribal Entities do not quarrel with the proposition that Godfrey would have been held to the forum selection clause had it been sued by another party. Instead, the Tribal Entities maintain that "mutuality" is limited to the idea that "secret principal[s]" and "co-conspirator[s]" may "enforce a forum-selection clause of its partner or puppet."[75] Again, there is nothing in our case law that suggests that "mutuality" is limited to these situations. Rather, these situations simply represent the factual scenarios in which we have been called upon to apply the general principal of mutuality. *See Adams*, 702 F.3d at 442–43; *Frietsch v. Refco, Inc.*, 56 F.3d 825, 827 (7th Cir. 1995).

Here, where it is clear that Godfrey was intimately involved in the negotiations leading to, and the documents embodying, the bond transaction, and where the Tribal Entities do not take exception to the conclusion that Godfrey would be bound by the forum selection clauses in the Bond Documents, we believe that the concepts of affiliation and mutuality are met.

Moreover, we believe that this is a particularly appropriate case to allow a nonparty to invoke a forum selection clause. Godfrey was not simply counsel to the Tribal Entities, it was bond counsel to the transaction. As one commentator has observed, "[a]lthough bond counsel is usually retained by the issuer, bond opinions must be completely objective, since they will not serve the function of facilitating the sale of bonds unless they are accepted as reliable in the bond market." 2 James A. Coniglio & M. David Gelfland,

---

[75] *Id.* (internal quotation marks omitted).

State & Federal Government Debt Financing § 16.16 (2d ed. 2015). Indeed, some courts have recognized that "an attorney who issues an opinion letter for the purpose of inducing a non-client to purchase municipal notes or bonds can be liable for negligent misrepresentation when the opinion letter contains material misstatements of fact." *Mohaffy, Rider, Windholz & Wilson v. Central Bank of Denver*, 892 P.2d 230, 233 (Col. 1995);[76] *cf.* Restatement (Third) of the Law Governing Lawyers § 51(2)(a) (2000) (stating that a lawyer owes a duty of care to a nonclient when the lawyer or his client "invites the nonclient to rely on the lawyer's opinion…and the nonclient so relies").

Additionally, as the district court explained:

> [W]hile [the Tribal Entities] have sued Godfrey in [tribal] court, they assert no claims against Godfrey. Rather, Godfrey is a defendant in that suit for the sole purpose of binding them to any determination regarding the validity of the Bond Documents, even though defendants contend in this court that Godfrey is a "stranger" to those documents. Essentially, de-

---

[76] The general rule in Wisconsin is that "an attorney c[an] not be held liable to third parties for any acts committed within the scope of an attorney-client agency relationship." *Green Spring Farms v. Kersten*, 401 N.W.2d 816, 823 (Wis. 1987). However, the Wisconsin courts have deviated from the general rule, and the following factors have guided that determination: "(1) the extent to which the transaction was intended to affect the plaintiff; (2) the foreseeability of harm to the plaintiff; (3) the degree of certainty that the plaintiff suffered harm; (4) the nexus between the defendant's conduct and the plaintiff's harm; and (5) the policy of preventing future harm." *Id.*

> fendants have obliged Godfrey to defend the
> Bond Documents' validity in tribal court while
> maintaining in this court that those documents
> give Godfrey no enforceable rights. Those posi-
> tions are inconsistent, and the court would be
> disinclined to foreclose Godfrey from the bene-
> fit of the documents' forum selection clause
> given the nature of the tribal court action.[77]

We do not perceive any jurisdictional or legal impedi-
ments to Godfrey's relying on the forum selection clauses in
the Bond Documents.[78] We therefore reverse the judgment of
the district court denying Godfrey a preliminary injunction.

Because the district court determined that Godfrey was
not likely to succeed on the merits of its claim, the district
court did not reach the other elements of the preliminary in-
junction analysis, namely whether Godfrey had an adequate
remedy at law, whether Godfrey would suffer irreparable
harm, whether the balance of harms weighed in favor of an
injunction, and whether issuing a preliminary injunction
was in the public interest. *See, e.g., Ferrell v. U.S. Dep't of
Hous. & Urban Dev.*, 186 F.3d 805, 811 (7th Cir. 1999). We
therefore remand this action to the district court so that it
may complete this analysis and determine whether a prelim-
inary injunction should issue in favor of Godfrey.

---

[77] R.175 at 44 (internal citation omitted).

[78] We do note that this aspect of the case would have been much simpler
had there been a specific forum selection clause in the Bond Documents
governing disputes involving bond counsel.

**Conclusion**

We conclude that there were no impediments to the district court's consideration of the Financial Entities' and Godfrey's challenges to tribal court jurisdiction. Our decision in *Altheimer & Gray* forecloses the Tribal Entities' argument that exhaustion of tribal court remedies was required. Similarly, we conclude that the Bond Documents contain valid and effective waivers of the Tribal Entities' sovereign immunity.

With respect to the merits of the Financial Entities' motion for a preliminary injunction, the district court correctly concluded that the Financial Entities were likely to succeed on the merits of their claim that the tribal court lacked jurisdiction over them. We therefore affirm the judgment of the district court with respect to the grant of preliminary injunctive relief to the Financial Entities.

We reverse, however, the district court's denial of preliminary injunctive relief to Godfrey. The district court erred in concluding that it lacked subject matter jurisdiction over Godfrey, and that error colored its view of Godfrey's likelihood of success on the merits. Godfrey, like the Financial Entities, may invoke the forum selection clauses in the Bond Documents and, consequently, is likely to succeed on its claim that the tribal court lacks jurisdiction over it in this bond-related action. We therefore remand to the district court for further proceedings to determine whether, given the other preliminary-injunction factors, an injunction should issue in favor of Godfrey.

AFFIRMED IN PART;

REVERSED AND REMANDED IN PART